OPINION
{¶ 1} Defendant-appellant Christopher A. Williams appeals from his conviction and sentence in the Licking County Court of Common Pleas on one count of aggravated murder, in violation of R.C. 2903.01(B), one count of aggravated robbery, in violation of R.C. 2911.01(A)(1) and/or (A)(3), one count of aggravated burglary, in violation of R.C. 2911.11(A)(1) and/or (A)(2), and one count of escape, in violation of R.C. 2921.34(A)(1) and (C)(2). The plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 2} Appellant was indicted on one count of aggravated murder, in violation of R.C. 2903.01(B), one count of aggravated robbery, in violation of R.C. 2911.01(A)(1) and/or (A)(3), one count of aggravated burglary, in violation of R.C. 2911.11(A)(1) and/or (A)(2), and one count of escape, in violation of R.C.2921.34(A)(1) and (C)(2). The aggravated murder charge arose from the murder of Rhonda Boggs.[1] The central issue upon appeal is whether appellant murdered Rhonda Boggs.
 {¶ 3} The matter proceeded to a jury trial. The trial began on March 15, 2005, and concluded on March 28, 2005. The following evidence was adduced at trial.[2]
 {¶ 4} On the morning of April 29, 2002, Rhonda Boggs was found murdered in the kitchen of her home in Pataskala, Ohio. In addition, the house appeared to have been ransacked and several items of property were found to be missing from the house. In particular, two guitars, Mrs. Boggs' purse and some of Mrs. Boggs' clothes, shoes and jewelry were missing.
 {¶ 5} In general, the murder happened sometime on April 28, 2002 or early morning on April 29, 2002. Mrs. Boggs' daughter, Amanda, was found in the house with her mother. Amanda was two years and eight months old at the time. Shortly thereafter, Amanda was interviewed by a social worker. During this interview, Amanda said that "Nick" did it. Mrs. Boggs' husband, David Boggs, was incarcerated at the time. He was also interviewed. Mr. Boggs' had a cousin named Richard Robinson who was called "Nick."[3]
 {¶ 6} Robinson was questioned by police. Ultimately, Robinson confessed to the murder and theft offenses. In total, Robinson repeatedly confessed to authorities. As a result, Robinson was arrested, charged and indicted for the murder and related charges.
 {¶ 7} After a period of time, the Ohio Bureau of Criminal Investigation (BCI) became involved in the investigation. As a result, Christopher A. Williams, the defendant-appellant, herein, was arrested and indicted for the murder of Mrs. Boggs. Charges against Robinson were dismissed.
 {¶ 8} Evidence revealed that Robinson was accounted for as follows at or around the time of Mrs. Boggs' murder. On April 28, 2002, Robinson met a group of people at a bar called Merry Melody's in advance of a golf outing at approximately 9:30 a.m. to 10:00 a.m. Merry Melody's is in the southeast part of Columbus. He then traveled to the golf outing finally returning to that same bar at approximately 6:00 p.m. to 6:30 p.m. According to several witnesses, he did not leave there until somewhere around 10:15 to 10:30 p.m.
 {¶ 9} Once leaving there, witnesses indicated that Robinson arrived at the Fairview Inn (a bar) in Lancaster, Ohio, at approximately 11:00 p.m. He arrived at approximately five minutes before the end of a hockey game that concluded at 11:04 p.m. The time elapsed between leaving Merry Melody's and arriving at the Fairview Inn was just enough time to make that trip. During the trip between the two bars, Robinson had several telephone conversations with his wife, which were confirmed by telephone records.
 {¶ 10} Robinson did not leave the Fairview Inn until sometime close to 1:00 a.m., on April 29, 2002. After leaving the Fairview Inn, Robinson arrived at his home at 1:30 a.m., enough time to travel from this bar to his home, but not enough time to travel from the bar to the Boggs' home and then to Robinson's home.
 {¶ 11} Appellant testified on his own behalf and attempted to account for his whereabouts and conduct at and around the time Mrs. Boggs was killed. Appellant had been in a half-way house as a result of violating post-release control imposed when appellant was released from prison. According to appellant, he left the half-way house on a 24 hour pass on April 26, 2002. However, due to a series of alleged mishaps, appellant did not return to the half-way house at the required time. However, appellant decided to return to the half-way house on Sunday, April 28, 2002. On the way back, he decided to get high on crack cocaine.
 {¶ 12} Appellant purchased crack cocaine in Columbus. Appellant then continued his trip back to Licking County, smoking the crack along the way. Appellant said there was a good possibility, however, that he went back and bought some more crack in Columbus. Around 5:00 or 5:30 p.m., appellant decided to go visit his friend David Boggs and use his bathroom. Upon arriving, appellant knocked on the door but no one responded. Appellant then walked around to the side of the house and relieved himself. Afterwards, appellant noticed a purse sitting on the Boggs' car. Appellant took the purse to the door and knocked again. When no one answered, appellant took the purse to his car. According to appellant, he decided to take the money in the purse and go buy more drugs.
 {¶ 13} Appellant drove to the house of Bob Sisco in Millersport, Ohio. Sisco was another friend of appellant. Appellant and Sisco talked. They discussed many topics, including the band that appellant and David Boggs used to be in together and the fact that Mr. Boggs was in jail. Appellant admitted, however, that his real purpose for stopping at Sisco's house was to purchase powdered cocaine. Appellant left around 7:00 p.m. and headed back to Columbus to buy more crack cocaine. Along the way, appellant stopped for gasoline and used Mrs. Boggs' credit card for the purchase at around 7:30 p.m. Ultimately, appellant purchased more crack cocaine. Afterwards, appellant began to drive back to Licking County, driving and smoking crack and, he believes, probably drinking.
 {¶ 14} Appellant testified that he believed that sometime between midnight and 2:00 a.m. he drove by the Boggs' residence to return Mrs. Boggs' purse. Appellant felt that Mrs. Boggs would discover that he had taken her purse and felt remorse for having taken it, especially knowing that Mr. Boggs was in jail. Therefore, he decided to return the purse. Appellant testified he arrived at the Boggs' residence "between . . . 10 — 10 to 11, somewhere around that time." Tr. 1996.[4] Appellant saw an SUV in the driveway.
 {¶ 15} Appellant parked his car down the road from the Boggs house and ran towards the house in an attempt to return the purse without being spotted. As he approached the house, appellant claimed that he heard screams. Appellant ran back to his car. Appellant drove off and drove around for about 20 minutes. He then returned to the house. Appellant testified that at that point, he saw Nick Robinson coming out of the Boggs' house. He watched as Robinson got in his SUV and drove off.
 {¶ 16} Appellant went in the Boggs' house. In the kitchen, he found Mrs. Boggs laying on the floor. Appellant claimed the he shook her and felt for a pulse. He saw a knife dangling off her neck. Appellant picked the knife up and held it. He then dropped the knife and walked through the rest of the house. At that point, appellant "freaked out" and left.
 {¶ 17} Appellant claimed that after this incident, he drove around getting high and drinking for two days. Eventually, about two days later, appellant sold his car. Appellant then stole a car and drove around the rest of the week doing "more of the same." Tr. 2007. Appellant described it as being "in the middle of a drug binge." Id. He was "a mess" and feeling suicidal. Tr. 2008.
 {¶ 18} Evidence showed that Mrs. Boggs had been stabbed 19 times and suffered multiple superficial cutting injuries. The murder weapon was a steak knife with a black handle. The knife was found under Mrs. Boggs' body. Appellant's DNA was found on the knife and on Mrs. Boggs hands. Robinson's DNA was not found on the knife or Mrs. Boggs. However, DNA that generally matched that of Mrs. Boggs was found on a leatherman multi-tool belonging to Robinson.
 {¶ 19} Following deliberations, the jury returned a verdict of guilty on all counts. Appellant was sentenced to serve a prison term of 20 years to life on the count of aggravated murder; a prison term of ten years on the count of aggravated robbery; a prison term of ten years on the count of aggravated burglary; and a prison term of eight years on the count of escape. The trial court ordered that all sentences be served consecutively to all other sentences.
 {¶ 20} It is from these convictions that appellant appeals, raising the following assignments of error:
 {¶ 21} "I. THE TRIAL COURT COMMITS PREJUDICIAL ERROR IN ALLOWING THE CORONER TO CHANGE HIS OPINION ON THE TIME OF DEATH, TO ASSIST THE PROSECUTION IN THEIR THEORY OF THE CASE, CONTRA THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.
 {¶ 22} "II. PLAIN ERROR OCCURS WHEN TESTIMONY OF PLEA NEGOTIATION IS ADMITTED AT TRIAL, CONTRA EVID. R. 410, AND THE FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.
 {¶ 23} "III. PLAIN ERROR OCCURS WHEN THE RESULTS OF A POLYGRAPH TEST ON THE STATE'S PRIMARY WITNESS ARE INTRODUCED THROUGH A STIPULATION, CONTRA THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.
 {¶ 24} "IV. WHERE NUMEROUS VIOLATIONS OF THE RULES OF EVIDENCE OCCUR DURING THE COURSE OF A JURY TRIAL, THE ACCUSED DOES NOT RECEIVE A FAIR TRIAL WHEN THE CUMULATIVE EFFECT VIOLATES THE FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE FEDERAL CONSTITUTION AND TO THE OHIO CONSTITUTION.
 {¶ 25} "V. INEFFECTIVE ASSISTANCE OF COUNSEL OCCURS WHEN SIGNIFICANT ERRORS RESULT IN THE ACCUSED NOT RECEIVING A FAIR TRIAL CONTRA THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.
 {¶ 26} "VI. (A) THE VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE. (B) THE VERDICT IS INSUFFICIENT AS A MATTER OF LAW TO SUPPORT A CONVICTION CONTRA THE SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION."
 I {¶ 27} In the first assignment of error, appellant contends that the trial court committed prejudicial error when it allowed the coroner to change his opinion about Mrs. Boggs' time of death to assist the prosecution. We find no reversible error.
 {¶ 28} Testimony showed that, initially, Dr. Jeffrey Lee, the Licking County Chief Forensic Pathologist and Deputy Coroner, determined that the estimated time of Mrs. Boggs' death was midnight, with a range from 10:00 P.M. April 28, 2002, to 2:00 a.m. April 29, 2002. Tr. 528. This time range was stated on the death certificate. Tr. 592. Dr. Lee used his standard method, based on rigor mortis, livor mortis and the temperature of the body, to make that determination.
 {¶ 29} However, Dr. Lee testified that in December, 2003, he was asked by Ken Oswalt (the Licking County Prosecutor) to make a more accurate or "good" time of death. Tr. 527; 642.[5] As a result, Dr. Lee researched methods of determining a time of death. Dr. Lee found another method, known as the Henssge method in a textbook entitled "Forensic Pathology." Tr. 525. The textbook included several references to the method and referred to research and/or peer review articles in which it had been published. Tr. 532. Dr. Lee testified that the method outlined in the textbook had sufficient scientific and medical reliability to be used to determine an estimated range for the time of death. Tr. 525-526. Using this method, Dr. Lee determined that there was a 95% chance that the time of death was between 3:45 p.m. on April 28, 2002, and 12:45 a.m. on April 29, 2002, and a 67% chance that the time of death was between 6:45 p.m. and 9:45 p.m. on April 28, 2002. On cross examination, Dr. Lee admitted that he had never used this method before or had a need to use it since. Tr. 623; 638.
 {¶ 30} Essentially, appellant asserts that there are two problems with Dr. Lee's testimony. First, appellant contends that Dr. Lee's opinion was beyond his authority jurisdictionally since a coroner does not have authority under Ohio law to testify about the criminal responsibility for a death. Appellant asserts that Dr. Lee changed the time of death so that the prosecution could pursue appellant as a suspect. Appellant submits that because Dr. Lee changed the time of death so dramatically that Dr. Lee, in essence, assigned the criminal responsibility to appellant for the death.
 {¶ 31} Second, appellant notes that medical opinion testimony must be based upon a reasonable degree of medical certainty or probability. Appellant points out Dr. Lee admitted that he had never used this method before to determine a time of death and has not used it since. Appellant concludes that this second estimate for the time of death was speculative and based on an unreliable theory.
 {¶ 32} The admission or exclusion of relevant evidence rests within the sound discretion of the trial court and that court's ruling on such matters will not be reversed absent an abuse of discretion. See Krischbaum v. Dillon (1991), 58 Ohio St.3d 58,66, 567 N.E.2d 1291; Rigby v. Lake Cty. (1991),58 Ohio St.3d 269, 271, 569 N.E.2d 1056. In order to find an abuse of discretion, we must determine that the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 450 N.E.2d 1140.
 {¶ 33} Upon review we conclude that the trial court did not abuse its discretion when it permitted Dr. Lee to testify to the time of death as he calculated using the Hennsge method. First, a coroner is empowered to investigate facts "concerning the time,
place, manner and circumstances of the death." State ex rel.Blair v. Balraj (1994), 69 Ohio St.3d 310, 312 (emphasis added). Accordingly, a coroner can express his medical, expert opinion as to the time of death. Simply because that time of death is supportive of the State's theory of prosecution does not mean that the coroner has exceeded that authority and assigned criminal responsibility. In fact, Dr. Lee testified that when he was asked to make a more accurate estimate of the time of death, he had no idea whether the State hoped for an earlier or later time of death. Further, an expert is generally permitted to change their expert opinion.[6] An expert cannot be locked into an opinion that he chooses to change after continued research and re-assessment.
 {¶ 34} Second, we find that the trial court did not abuse its discretion when it permitted Dr. Lee to give his opinion as to the time of death based on the Hessnge method. An expert's testimony must be "based on reliable scientific, technical, or other specialized information." Evid. R. 702(C). To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply: (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles; (2) The design of the procedure, test, or experiment reliably implements the theory; (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result. Evid. R. Rule 702 (C).
 {¶ 35} Dr. Lee testified that the second method, the Hessnge method, was an appropriate method to estimate a time of death. Dr. Lee stated that this method was included in a forensic pathology textbook and had "sufficient scientific and medical reliability." Dr. Lee testified that this method was one that other pathologists have used to determine time of death and that he followed the correct procedure in using this method. Tr. 525. Accordingly, we find that the trial court did not abuse its discretion in allowing Dr. Lee's opinion based on the Hessnge method.
 {¶ 36} We are cognizant of the fact that appellant argues that Dr. Lee set out to find a method that would set the time of death so that appellant would remain a viable suspect and has never used this method before or since this one usage. However, such issues are for the jury to consider. The jury was aware of the original estimated time of death and the subsequent change. In a jury trial, the credibility of the witness is a question solely within the province of the jury. State ex rel. Wise v.Chand (1970), 21 Ohio St.2d 113, 119, 256 N.E.2d 613. Apparently, the jury found Dr. Lee and his explanation for his change of estimated time of death to be credible.
 {¶ 37} Accordingly, appellant's first assignment of error is overruled.
 II {¶ 38} In the second assignment of error, appellant contends that plain error occurred when testimony from plea negotiations conducted on December 2, 2003, was admitted at trial. We disagree.
 {¶ 39} Appellant correctly states this court's standard of review. Ultimately, no objection was made to this testimony.[7] An error not raised in the trial court must be plain error for an appellate court to reverse. State v. Long
(1978), 53 Ohio St.2d 91, 372 N.E.2d 804; Crim.R. 52(B). In order to prevail under a plain error analysis, appellant bears the burden of demonstrating that the outcome of the trial clearly would have been different but for the error. Long, supra. Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." Id. at paragraph three of the syllabus.
 {¶ 40} Gregg Costas, a special agent for the Ohio Bureau of Criminal Investigation (BCI), testified for the prosecution. In February of 2003, the Licking County Prosecutor's Office asked Costas to conduct an independent investigation of the Boggs' murder. Tr. 1288. Subsequently, Costas interviewed both Robinson and appellant. At trial, during direct examination, Costas testified about an "interview" or sworn statement given by appellant on December 2, 2003. Costas testified that prosecutors, appellant's defense attorney, Detective Brooks and a court reporter were at the interview. Costas reiterated appellant's statement from that interview. On appeal, appellant asserts that Costas' testimony about appellant's sworn statement given that day was inadmissible because the statement was given during plea negotiations.
 {¶ 41} Evidence Rule 410(A)(5) prohibits the admission of statements made during plea negotiations.[8] "In determining admissibility of statements made during alleged plea discussions, the trial court must first determine whether, at the time of the statements, the accused had a subjective expectation that a plea was being negotiated. The trial court must then determine whether such an expectation was reasonable under the circumstances." State v. Frazier (1995), 73 Ohio St.3d 323,652 N.E.2d 1000, syllabus.
 {¶ 42} In this case, appellant's statement was preceded by an oral and written Miranda warning which indicated that any statements made by appellant could be used against appellant in a court of law. Tr. 1337. Such a warning is not consistent with the assertion that the statement was made during plea negotiations. Further, appellant agreed to "waive the provision of Evidence Rule 408 and 410 that might otherwise be applicable to the interview . . . notwithstanding there may be references in said interview statements that may be covered by the provision of either rule."[9] Transcript of Sworn Statement given by Christopher A. Williams, December 2, 2003.
 {¶ 43} Accordingly, we find appellant's assertion to be without merit. Appellant's second assignment of error is overruled.
 III {¶ 44} In the third assignment of error, appellant asserts that plain error occurred when a stipulation concerning the results of a polygraph test conducted on Robinson was read by the jury. We disagree.
 {¶ 45} The stipulation in question was entered into by the parties and read to the jury. The stipulation concerned the polygraph test taken by Robinson. The stipulation was preceded by a Memorandum of Understanding, filed March 8, 2005, which attempted to explain, at least in part, the tactical reasons both parties had for entering into stipulations. Generally, the Memorandum indicated that the stipulations were entered into with the understanding that both parties may have the right to raise certain objections to certain evidence. Each party then agreed not to raise certain objections against evidence referred to in the stipulations. The stipulation in question essentially stated that the parties agreed to the admission of the following: 1) Robinson took a polygraph; 2) that the test results and circumstances were examined by an expert; 3) the expert concluded that, under the circumstances of the test, most individuals would show deception; 4) in his expert opinion, the test results were unreliable; and 5) the test should not have been given to Robinson at that time.[10] When this stipulation was read to the jury, the jury had already heard Robinson testify that he took a lie detector test and failed the test.
 {¶ 46} Generally, polygraph evidence is inadmissible in a criminal trial unless certain prerequisites are met. State v.Souel (1978), 53 Ohio St.2d 123, 373 N.E.2d 1318. Those criteria were not met in this case. However, in this case, we find no grounds for reversal. The error, if any, was invited error since the defense stipulated to the matter now being challenged. A litigant may not take advantage of an error which he himself invited or induced. See State v. Campbell (2000),90 Ohio St.3d 320, 423, 738 N.E.2d 1178; State v. Greene (May 14, 1999), Sandusky App. No. 5-98-026, 1999 WL 299744; State v. Kneip
(1993), 87 Ohio App.3d 681, 686, 622 N.E.2d 1138.
 {¶ 47} Accordingly, this court finds no plain error. Appellant's third assignment of error is overruled.
 IV {¶ 48} In the fourth assignment of error, appellant contends that the cumulative effect of numerous violations of the rules of evidence denied appellant a fair trial. We disagree.
 {¶ 49} Appellant relies on State v. DeMarco (1987),31 Ohio St.3d 191, 509 N.E.2d 1256, which held as follows: "Although violations of the Rules of Evidence during trial, singularly, may not rise to the level of prejudicial error, a conviction will be reversed where the cumulative effect of the errors deprives a defendant of the constitutional right to a fair trial." Id, syllabus at paragraph 2. In order for the appellant to show cumulative error, appellant must demonstrate that but for the errors there was a reasonable probability that the outcome of the trial would have been different. State v. Moreland (1990),50 Ohio St.3d 58, 552 N.E.2d 894.
 {¶ 50} This court will briefly review the alleged errors which he contends had a cumulative effect on his trial and the State's response:
 {¶ 51} 1) Appellant claims that David Boggs, the victim's husband, attempted to inflame the jury's passion by making inflammatory comments regarding appellant's drug use and behavior and commenting on appellant's prior conviction for "robbing places." In each case, appellant's counsel objected and the objection was sustained. In response to appellant's argument, the State points out that the jury was given a curative instruction, informing the jury to ignore the answer to any question if an objection was sustained, and that the jury already knew of appellant's drug use and convictions for robbery, receiving stolen property (2 counts) and unauthorized use of a motorized vehicle, through other testimony.
 {¶ 52} 2. Appellant contends that statements by David Boggs and his mother, Clarise Boggs, constituted hearsay. Specifically, both David Boggs and Clarise Boggs testified that the night the victim was murdered, the victim stated to them that she was going to go home (from Clarise Boggs' home), get Amanda ready for bed and then get ready for work. Appellant's counsel objected but the objection was overruled. On appeal, appellant contends that not only was this hearsay but it was also highly emotional testimony of the victim. In response, the State admits that it was hearsay but it falls under the then existing state of mind exception, Evid. R. 803(3), because it shows the intent of the victim.[11]
 {¶ 53} 3. Appellant contends that the State used leading questions with editorials by the prosecutor during the redirect examination of Robinson. Ultimately, an objection was sustained multiple times. In essence, appellant contends that the prosecutor was testifying. The State responds that the objections were sustained and appellant suffered no prejudice because the questions all concerned Robinson's statements to police and those statements were admitted by agreement.
 {¶ 54} 4. Appellant contends that highly prejudicial hearsay was admitted through the testimony of Deputy Koch, who testified that when he arrived at appellant's house, appellant's mother told him that appellant was in the basement cleaning his shoes. Appellant's counsel objected but the objection was overruled. The State responds that the hearsay testimony was admissible as present sense impression pursuant to Evid. R. 803(1).[12]
 {¶ 55} Appellant contends that there were several improper questions and responses by the prosecutor during the defense's case in chief:
 {¶ 56} a. Appellant contends that an improper question was asked during the cross examination of Kathleen Klingensmith. Klingensmith was employed as an intake social worker for Licking County Job and Family Services. Tr. 1697. Klingensmith interviewed Amanda shortly after the murder was discovered. Klingensmith testified that Amanda immediately told her that it was "Nick" who had hurt her mother.[13] However, on cross examination, the prosecutor asked Klingensmith if in a second interview concluded two weeks later, Amanda had said "Bob" did it. Klingensmith affirmed that Amanda had said that "Bob" did it. Appellant contends that this was inadmissible hearsay. Appellant argues that by the time of the second interview, Amanda was not under stress and had had time to think. The State responds that this was not hearsay. The evidence was not offered to prove the truth of the matter asserted. Instead, it was offered to impeach the hearsay evidence as to what Amanda said. See Evid. R. 806.[14]
 {¶ 57} b. Appellant contends that the prosecutor editorialized in its cross examination of Detective Brooks, who had been called as a defense witness. In addition, appellant contends that the prosecutor raised the issue of false confessions and in particular, mentioned a rape case from New York City involving false confessions. Appellant contends that there was no foundation laid for that issue. In both instances, appellant's defense counsel objected and the objections were sustained. In response, the State argues that the jury was instructed to disregard any questions to which an objection was sustained and that the idea of a false confession is within the understanding of the common juror, citing Crane v. Kentucky
(June 9, 1986), 476 U.S. 683, 687-88, 106 S.Ct. 2142,90 L.Ed2d 636 Last, the State points out that a party is given wide latitude on cross examination.
 {¶ 58} c. Appellant contends that inadmissible hearsay was admitted during the cross examination of Neva Good. Neva Good was a neighbor of Mr. and Mrs. Boggs. Neva Good testified that she saw a man she later identified as Robinson coming out of Boggs' house after the victim was believed to have been murdered. On cross examination by the prosecutor Neva Good admitted that she had agreed with her husband when he asserted that Neva could not be sure it was Robinson. Appellant contends that this was hearsay because the husband was not testifying. However, the State responds that this was not error. The State argues that Mrs. Good was questioned about a question by her husband to which she had agreed was true. Therefore, the State argues that Mrs. Good adopted the statement as her own and as such, it did not constitute hearsay, citing State v. Mitchell (Feb. 3, 1983), Cuyahoga App. No. 45014, 1983 WL 5738.
 {¶ 59} 6. Appellant also argues that there were several errors by the prosecutor in his rebuttal in closing arguments.
 {¶ 60} a. Appellant contends that the prosecutor degraded defense counsel when the prosecutor stated that if Robinson were the defendant, the same lawyers would be arguing that Amanda was not credible. Appellant's counsel raised an objection. The objection was overruled. The State responds that generally, there is a wide latitude granted a party in closing argument. Further, the State argues that the statement was not meant to be derogatory but was meant to show that any defense lawyer could successfully attack the reliability of Amanda's statements, especially since she had identified different men at different times as the assailant and had stated at one time, that her mother got up that morning and fed and dressed Amanda.
 {¶ 61} b. The prosecutor stated that if the recorded confession by Robinson was played at an interrogation class, there would be a "gasp so loud." Tr. 2218. In addition, the prosecutor stated that he was embarrassed by the confession tape. Defense counsel objected, however, the objection was overruled. Appellant argues that the comments were demeaning to the law enforcement officers who investigated the murder. In addition, these were attempts to show that the confession was false without laying a foundation regarding the law of false confessions. Last, appellant argues that the prosecutor was vouching for the contention that the confession was coerced although there was no evidence as to what a confession class would do if it heard the recorded confession. The State responds that the comment was not improper. Lieutenant Brooks conceded during his testimony that at least a portion of the interrogation was "probably improper." See Tr. 1789-1807.[15] Essentially, the State argues that the comments were simply a colorful way to express to the jury that the confession was unreliable.
 {¶ 62} 7. Last, appellant incorporates the issues that have been previously raised in this appeal in other assignments of error, namely, permitting the coroner to change the time of death; introducing plea negotiations; and introducing polygraph testimony. The State responds that these issues did not constitute error, as addressed in the other assignments of error.
 {¶ 63} Upon review, this court recognizes that many of the raised issues may not constitute error at all. However, we find that even if these alleged errors were error, the cumulative effect did not deny appellant a fair trial.
 {¶ 64} Accordingly, appellant's fourth assignment of error is overruled.
 V {¶ 65} In the fifth assignment of error, appellant argues that he was denied the effective assistance of trial counsel. We disagree.
 {¶ 66} A claim of ineffective assistance of counsel requires a two-prong analysis. The first inquiry is whether counsel's performance fell below an objective standard of reasonable representation involving a substantial violation of any of defense counsel's essential duties to appellant. The second prong is whether the appellant was prejudiced by counsel's ineffectiveness. Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct. 2052, 80 L.Ed.2d 674; State v. Bradley (1989),42 Ohio St.3d 136, 538 N.E.2d 373.
 {¶ 67} In determining whether counsel's representation fell below an objective standard of reasonableness, judicial scrutiny of counsel's performance must be highly deferential. Bradley,
supra at 142. Because of the difficulties inherent in determining whether effective assistance of counsel was rendered in any given case, there is a strong presumption that counsel's conduct fell within the wide range of reasonable, professional assistance.Id.
 {¶ 68} To demonstrate prejudice, appellant must show that error on the part of counsel was so serious in nature that there exists a reasonable probability that, in the absence of the error, the result in the trial court would have been different.Bradley, supra. The United States Supreme Court and the Ohio Supreme Court have both held that a reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Id. at 143 (citing Strickland,466 U.S. at 697).
 {¶ 69} Appellant's arguments concern the first and second assignments of error. First, appellant asserts that Agent Costas' testimony as it concerns appellant's statements made allegedly during plea negotiations should have been excluded. See assignment of error II. Initially, appellant's counsel objected to this testimony and then withdrew the objection. Appellant argues that defense counsel's failure to recognize this issue and continue the objection forced appellant to testify on his own behalf and denied appellant a fair trial. Appellant asserts that without Costas' testimony, it was highly probable that the result or outcome of the trial would have been different.
 {¶ 70} Second, appellant submits that it was ineffective assistance of counsel when defense counsel entered the stipulation concerning the polygraph test taken by Robinson. Appellant argues that the stipulation "enormously" assisted the prosecution in proving its case.
 {¶ 71} Upon review we find appellant's assignment of error without merit. In assignment of error II, this court noted that there is no support in the record for appellant's proposition that the sworn statement was given as part of plea negotiations. As such, we find no basis in the record to find defense counsel was ineffective for failing to object to the testimony on that basis.
 {¶ 72} As to appellant's contention that defense counsel was ineffective for entering into the stipulation concerning the polygraph test, we find no grounds for reversal. Debatable trial tactics and strategies generally do not constitute deficient performance. State v. Phillips (1995), 74 Ohio St.3d 72, 85,656 N.E.2d 643, State v. Clayton (1980), 62 Ohio St.2d 45, 49,402 N.E.2d 1189. However, a trial tactic or strategy constitutes ineffective assistance and reversible error if it is such a deviation from the norm that ordinary trial counsel would "scoff" at hearing of it. State v. Burgins (1988), 44 Ohio App.3d 158,160, 542 N.E.2d 707.
 {¶ 73} In this case, the decision to enter the stipulation, especially in light of the Memorandum of Understanding which indicates that the parties agreed to allow some evidence in without objection in a trade-off type manner, was a trial tactic and strategy. Further, there was other evidence presented in regard to the polygraph test. That evidence demonstrated that Robinson failed the test. Such evidence was beneficial to appellant. When reviewed in toto, we find counsel was not ineffective for entering into the stipulation.
 {¶ 74} For the foregoing reasons, appellant's fifth assignment of error is overruled.
 VI {¶ 75} In the sixth and final assignment of error, appellant contends that the verdict is against the manifest weight of the evidence and not supported by sufficient evidence. We disagree.
 {¶ 76} On review for sufficiency, a reviewing court is to examine the evidence at trial to determine whether such evidence, if believed, would support a conviction. State v. Jenks (1991),61 Ohio St.3d 259, 574 N.E.2d 492. On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717. See also, State v.Thompkins, 78 Ohio St.3d 380, 678 N.E.2d 541, 1997-Ohio-52. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Martin at 175.
 {¶ 77} Appellant points to the following pieces of evidence in support of his claims: Robinson repeatedly confessed to the crimes. Amanda, the victim's daughter, told a social worker that "Nick" (Robinson) was the assailant. Neva Good, a witness, saw a person who she later recognized as Robinson coming out of Boggs' residence at an estimated time of 8:40 p.m. on April 28, 2002. The victim's DNA was found on Robinson's leatherman tool. The coroner initially testified that the victim's time of death was midnight, which fit with Robinson's confessions. (It was only after the coroner was asked to "revisit" the time of death that the coroner arrived at the 6:45 p.m. time of death. This latter time of death was not arrived at until after appellant was interviewed by authorities.) Robinson knew that the victim's husband was in jail. Robinson and another patron at the "Merry Melodies" bar talked about leaving and getting some sex shortly before the murder. David Dell, a fellow inmate of Robinson, testified that he and Robinson had talked twice and that Robinson admitted to the murder in detail. Appellant testified at length and repeatedly denied harming Boggs and yet admitted that he was at the Boggs residence and admitted to the other offenses. (Specifically, appellant admitted to arriving at the Boggs' residence, seeing a purse and taking it.) Later, after purchasing more crack, appellant testified that he returned to the residence to return the purse, between midnight and 2:00 a.m., heard screams and turned around and went back to his car. Ultimately, appellant stated that he drove by again and saw Robinson come out of the front of the residence, go around to his SUV and leave. Appellant claimed that he then went into the residence, saw Boggs on the kitchen floor with a knife dangling from her neck. Appellant testified that he then took the knife out of her neck, checked for a pulse, freaked out and left.
 {¶ 78} However, the State contends that appellant ignores critical facts that prove that Robinson could not have committed the murder. Those facts entirely account for Robinson's whereabouts from roughly 10:00 a.m. on Sunday April 28, 2002, to at least 2:00 a.m. on Monday, April 29, 2002. These facts support the jury's verdict and conclusion that the appellant committed the murder.
 {¶ 79} Upon review, we find the verdict was supported by the evidence and not against the manifest weight of the evidence. There was evidence that accounted for Robinson's whereabouts at and around Mrs. Boggs' estimated time of death. The clothes that Robinson was wearing on the day of the murder were tested. Those clothes did not have human blood on them. Robinson was seen wearing boots that day but only tennis shoe prints from a single style shoe were found in the blood around the victim's body.[16]
 {¶ 80} In addition, none of Mrs. Boggs' blood was found in the vehicle Robinson was driving that night. This was despite the fact that Dr. Lee would have expected the perpetrator to be bloody.
 {¶ 81} DNA consistent with Boggs' DNA was found on a leatherman tool belonging to Robinson. However, this was not shown to be blood. Furthermore, as this sample was so small that the results were not definitive as 1 in 64 people would have this same partial DNA profile. Moreover, this is consistent with Mrs. Boggs having used that tool to open a beer bottle as Robinson claimed Mrs. Boggs had. Furthermore, this tool was not capable of causing the fatal wounds.
 {¶ 82} Moreover, certain things that Robinson included in his supposed "confession" did not occur. For instance, Robinson claimed to call the victim prior to going over, yet no such call occurred. Further, he stated that after he had accidentally stabbed Mrs. Boggs, he left and went to The Fairfield Inn and "shot some pool." However, as mentioned previoiusly, no blood was found on appellant's clothes when it would have been expected to be on the perpetrator. Further, Robinson testified that prior to his confession, the police volunteered information to him about the crime and suggested to him that he may have blacked out and just could not remember the events. Further, Robinson was led to believe the police could prove he murdered Mrs. Boggs, that he had failed the lie detector test and that he was looking at a death penalty. In addition, appellant's version of events placed Robinson at the Boggs' house at a time Robinson was placed, by objective people, at the Fairfield Inn.
 {¶ 83} Based upon all of this evidence, the jury was permitted to reasonably conclude that Robinson was telling the truth when he denied having anything to do with Mrs. Boggs' death.
 {¶ 84} We will now address the evidence which implicated appellant. DNA evidence tied appellant to the murder. Appellant's DNA was found on the murder weapon while Robinson's DNA was not. Expert testimony further indicated that had a person held the knife long enough to repeatedly stab Mrs. Boggs, DNA from that person would most likely be found on the knife, over that of a person who merely held the knife long enough to pull it out of the victim's neck and drop it as the appellant claimed. DNA matching appellant's DNA was found on both of Mrs. Boggs' hands.
 {¶ 85} Unlike Robinson, appellant's whereabouts were unaccounted for during the bulk of the time in question. David Boggs testified that two guitars were stolen from his home and that a third was left behind. Mr. Boggs stated that the guitar that was left behind looked more expensive than the ones which were taken, but was not. Thus, the evidence suggests that the person taking these guitars knew a good guitar from a lesser quality guitar. Appellant was a guitar player, while Robinson was not.
 {¶ 86} Finally, the jury may not have believed appellant's version of events. The jury was asked to believe that appellant, an admitted thief on a drug binge and AWOL from a halfway house, had merely gone to the Boggs' home to use the bathroom.[17]
Appellant had burglarized the home before. In addition, appellant learned from Robert "Bob" Sisco that David Boggs was in jail shortly before he went to the Boggs' residence the first time on April 28, 2002.
 {¶ 87} Furthermore, the other defense witnesses were impeached on evidence that would have otherwise helped the appellant. For instance, Neva Good claimed that she could identify Robinson, months after the incident, despite having only seen the back of the head of the person she saw at the Boggs' home at about 8:40 p.m. on April 28, 2002. This testimony was impeached by her admission that she could not be sure that it was Robinson. It was further impeached by substantial evidence that Robinson was at Merry Melody's bar at the time she saw someone at the Boggs' residence.
 {¶ 88} The credibility of the testimony from jailhouse snitch, David Dell, was questionable. Dell was in jail on a rape charge. The jury had reason to conclude that Dell was trying to curry favors. In addition, there were inconsistencies in Dell's claims and many of the details Dell gave about the murder had been publicized in the local newspaper, which was available to Dell while in jail.
 {¶ 89} In addition, the evidence placed appellant not only with a wallet and earrings belonging to the victim, but his car was found with ladies clothing, shoes, and a guitar cord all of which fit the description of things David Boggs indicated were taken from his home.[18] Although appellant's car was no longer in existence at the time of trial,[19] evidence showed that after the murder, appellant's car had "red stuff" all over the front seat, door and side of the car. The "red stuff" appeared to be two different colors of red.
 {¶ 90} Based upon all of these facts, after viewing the evidence in a light most favorable to the prosecution, we find that the jury could have found the essential elements of the crimes for which appellant was convicted were proven beyond a reasonable doubt. Further, we find that his is not "the exceptional case in which the evidence weighs heavily against the conviction". Martin, supra.
 {¶ 91} For the foregoing reasons, appellant's sixth assignment of error is overruled.
 {¶ 92} The judgment of the Licking County Court of Common Pleas is affirmed.
By: Edwards, J. Hoffman, P.J. and Wise, J. concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Licking County Court of Common Pleas is affirmed. Costs assessed to appellant.
[1] The counts of aggravated robbery and aggravated burglary also arise from appellant's conduct at the residence of Mrs. Boggs. The count of escape arose from appellant's unauthorized absence from a halfway house at and around the time of Mrs. Boggs' murder.
[2] A great deal of evidence was submitted at trial. The following statement of facts provides a general description of the facts. However, more details will be presented when the assignments of error are addressed.
[3] Nick had allegedly been to the Boggs house recently to repair the washing machine. According to Robinson, Mrs. Boggs had used Robinson's leatherman tool (a multi tool) which Robinson used in completing the repairs, to open a beer bottle.
[4] We recognize that this paragraph contains references to times that appear contradictory. However, those are the times to which appellant testified.
[5] However, Dr. Lee was not told whether the State was expecting the time of death to be earlier or later than the original estimate. Tr. 642.
[6] We note that appellant was not surprised at trial by Dr. Lee's change of expert opinion. As such, we distinguish it from cases where the expert did not provide the opinion prior to trial or changed his or her opinion at trial. See Wright v. SuzukiMotor Corp. Meigs App. Nos. 03CA2, 03CA3, 03CA4,2005-Ohio-3494.
[7] Appellant's counsel initially objected. However, after a recess, appellant's counsel withdrew the objection.
[8] "(A) Except as provided in division (B) of this rule, evidence of the following is not admissible in any civil or criminal proceeding against the defendant who made the plea or who was a participant personally or through counsel in the plea discussions: ". . .
"(5) any statement made in the course of plea discussions in which counsel for the prosecuting authority or for the defendant was a participant and that do not result in a plea of guilty or that result in a plea of guilty later withdrawn.
"(B) A statement otherwise inadmissible under this rule is admissible in either of the following:
"(1) any proceeding in which another statement made in the course of the same plea or plea discussions has been introduced and the statement should, in fairness, be considered contemporaneously with it;
"(2) a criminal proceeding for perjury or false statement if the statement was made by the defendant under oath, on the record, and in the presence of counsel." Evid. R. 410, in relevant part. Evid. R. Rule 410.
[9] Evidence Rule 408 states as follows: "Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution."
[10] The stipulation further stated that these facts would be read to the jury and admitted without objection, without need for any further evidence on the matter.
[11] Evidence Rule 803(3) states as follows: "The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . . A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will." Evid. R. 803(3).
[12] Evidence Rule 803(1) states as follows: The following are not excluded by the hearsay rule, even though the declarant is available as a witness: A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness." Evid. R. Rule 803(1).
[13] Amanda knew Robinson as "Nick".
[14] Evidence Rule 806 states as follows: "(A) When a hearsay statement, or a statement defined in Evid. R. 801(D)(2), (c), (d), or (e), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence that would be admissible for those purposes if declarant had testified as a witness.
"(B) Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain. . . .
"(D) If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine the declarant on the statement as if under cross-examination."
[15] Lieutenant Brooks conceded that in retrospect, it was probably improper to tell Robinson during the interrogation that he (Robinson) could be executed for this crime and because the Ohio Attorney General, Betty Montgomery, lives in Pataskala, the Attorney General and the Chief of Police would not let this crime go unsolved. Tr. 1789-1790.
[16] Tennis shoes with the same footwear patterns were never found.
[17] This version, of course, was not the appellant's first version of events regarding that night. In an interview conducted April 25, 2003, concerning the murder of Mrs. Boggs, appellant did not mention being at the Boggs' residence at all. However, the interview ended when police confronted appellant with evidence that he was at the Boggs' residence and appellant requested an attorney.
[18] Appellant sold his car after Mrs. Boggs was killed. The clothing, shoes and guitar cord found in his car were disposed of by a person detailing appellant's car after appellant sold the car.
[19] The car had been impounded, sold as scrap and destroyed after appellant sold the car.