DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Willie F. Evans IV, appeals his convictions and sentence in the Lorain County Court of Common Pleas. We affirm.
 I. {¶ 2} On April 13, 2006, shortly after midnight, Michael Smith was found stuffed in the trunk of his Ford Taurus, unconscious, with a single bullet wound in his abdomen. Mr. Smith died within hours as a result of massive internal bleeding. On July 12, 2006, a complaint was filed in the Lorain County Court of Common Pleas, Juvenile Division, alleging that Evans was a delinquent child by virtue of committing the crimes that led to Mr. Smith's death. On August 30, 2006, the juvenile court bound Evans over for prosecution as an adult. A grand jury indicted Evans on charges of aggravated murder in violation of R.C. 2903.01(A) and (B); murder in violation of R.C. 2903.02(A); felonious assault in violation of R.C. 2903.11(A)(1) and (A)(2), felonies of the second degree; aggravated robbery in violation of R.C. 2911.11(A)(1) and (A)(3), *Page 2 
felonies of the first degree; and tampering with evidence in violation of R.C. 2921.12(A)(1), a felony of the third degree. Each of the eight charges was accompanied by a firearm specification pursuant to R.C. 2941.145.
 {¶ 3} Evans requested discovery from the State on October 27, 2006, including "[a] written list of the names and addresses of all witnesses who the prosecuting attorney intends to call at trial[.]" The State identified thirty-one named witnesses on October 30, 2006. The record reflects one supplemental response, which provided the address of a witness previously identified, also filed on October 30, 2006. Evans' jury trial began on September 10, 2007, and continued for six days. Evans moved for dismissal of all charges pursuant to Crim. R. 29 at the close of the State's case and renewed his motion after resting on behalf of the defense. The trial court granted Evans' motion with respect to the firearm specification accompanying count eight of the indictment, which charged Evans with the crime of tampering with evidence, but denied his motion with respect to all other charges and specifications. The State presented one rebuttal witness over Evans' objection, a juvenile who had been in juvenile detention with Evans while he awaited trial.
 {¶ 4} The jury found Evans not guilty of aggravated murder in violation of R.C. 2903.01(A), as alleged in count one of the indictment, but guilty of aggravated murder in violation of R.C. 2903.01(B), all other charges, and the firearm specifications to counts two through seven. The trial court merged counts two through five, six and seven, and all firearm specifications for purposes of sentencing. Evans was sentenced to a term of life imprisonment without the possibility of parole with respect to count two; a nine-year term of imprisonment with respect to count six, to be served concurrently with the life sentence; and a three-year term *Page 3 
of imprisonment with respect to the firearm specifications, to be served consecutive to all other sentences. Evans timely appealed.
 II. ASSIGNMENT OF ERROR I "THE TRIAL COURT ERRED IN ALLOWING THE STATE TO INTRODUCE THE TESTIMONY OF A WITNESS NOT PROPERLY DISCLOSED IN DISCOVERY BEFORE TRIAL IN VIOLATION OF APPELLANT'S RIGHT TO A FAIR TRIAL GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION."
 {¶ 5} Evans' first assignment of error is that the trial court incorrectly permitted the State to call his former cellmate, T.W., as a rebuttal witness when the State did not disclose T.W.'s identity in response to Evans' discovery request. Evans objected, but did not request a continuance. He argues that the State violated its obligations under Crim. R. 16(B)(1)(e) and that the trial court should have sanctioned the violation by prohibiting the State from calling T.W. as a witness. This Court disagrees.
 {¶ 6} Crim. R. 16(B)(1)(e) requires the State, when ordered by the Court on motion of a defendant, "to furnish to the defendant a written list of the names and addresses of all witnesses whom the prosecuting attorney intends to call at trial, together with any record of prior felony convictions of any such witness, which record is within the knowledge of the prosecuting attorney." The rule imposes a continuing duty to supplement disclosures. Crim. R. 16(D). Trial courts may remedy violations of Crim. R. 16 by ordering the party to permit the discovery, granting a continuance, "prohibit[ing] the party from introducing in evidence the material not disclosed," or making "such other order as it deems just under the circumstances." Crim. R. 16(E)(3). *Page 4 
 {¶ 7} Because the "philosophy of the Criminal Rules is to remove the element of gamesmanship from a trial[, t]he state should furnish upon a proper demand the names of all witnesses it reasonably anticipates it is likely to call, whether in its case-in-chief or in rebuttal." State v.Howard (1978), 56 Ohio St.2d 328, 333. The threshold question, therefore, is whether the State reasonably anticipates that it is likely to call a rebuttal witness. State v. Lorraine (1993), 66 Ohio St.3d 414,423. A prosecutor does not have "a duty to provide the names of witnesses that he reasonably did not anticipate would testify until testimony was presented by appellant which was then properly rebutted." Id.
 {¶ 8} When disclosure of a rebuttal witness is required, failure to comply with Crim. R. 16 does not automatically warrant exclusion of the witness's testimony. State v. Finnerty (1989), 45 Ohio St.3d 104, 107. Instead,
 "Exclusion of the rebuttal witness' testimony is only one sanction among many that the trial court can impose. * * * `The court is not bound to exclude such material at trial although it may do so at its option. Alternatively, the court may order the noncomplying party to disclose the material, grant a continuance in the case or make such other order as it deems just under the circumstances.'" Id., quoting State v. Parson (1983), 6 Ohio St.3d 442, 445.
Trial courts have discretion to determine which sanction to impose, and this Court reviews that determination for an abuse of discretion. SeeFinnerty at 107; State v. Spikes, 9th Dist. No. 05CA008680,2006-Ohio-1822, at ¶ 29. When deciding whether an undisclosed rebuttal witness's testimony should have been excluded, courts consider whether the defendant requested a continuance; whether the trial court provided a limiting instruction regarding the witness's testimony; whether the failure to disclose was willful or inadvertent on the part of the State; and whether defense counsel was surprised by the ultimate disclosure, had the opportunity to voir dire the witness, and engaged in vigorous cross-examination. Finnerty at 107. *Page 5 
 {¶ 9} On September 13, 2007, the State subpoenaed the attendance of T.W., who was fifteen years of age at the time, to testify as a rebuttal witness. T.W. testified that he had shared a room with Evans in 2006 while both were committed to a juvenile detention facility. On September 28, 2006, T.W. met with a Lieutenant Rohner and, in a recorded interview, told Rohner that Evans had confessed his involvement in the shooting to T.W. At trial, T.W. testified that he had no independent recollection of his conversation with Lieutenant Rohner but, having had his memory refreshed, agreed that his statements regarding Evans were true.
 {¶ 10} The State argues that it became aware that T.W. was a potential witness during trial, disclosed the information to Evans' counsel "as soon as [the prosecuting attorney] possibly could," and took measures to provide defense counsel with an opportunity to prepare for his testimony. The State provided Evans' attorney with a recording of T.W.'s statement to police and made arrangements for counsel to interview T.W. on the morning of September 13, 2007.
 {¶ 11} Defense counsel objected, noting that T.W. had not cooperated during the September 13, 2007, interview:
 "THE COURT: So you spoke to the witness this morning. You had an opportunity to speak to this witness as well?
 "[COUNSEL]: He wouldn't really talk to me for the record. He wouldn't answer some of my questions. He was just very quiet, but I did sit in the same room with him and direct some questions to him.
 "THE COURT: Understanding had you been given this name a year ago, he could have chosen not to speak to you as well, correct?
 "[COUNSEL]: Possibly."
Counsel also argued that knowledge of T.W.'s statement would have changed his trial strategy and, specifically, the content of his opening statement. Evans has not directed this Court's attention to the portion of counsel's opening statement to which this objection referred, but in context of counsel's very brief statement, it appears to reference the following: *Page 6 
 "There are a lot of things not in dispute. The only thing in dispute is whether Mr. Evans was involved.
 "The evidence and the testimony will show you that he was not involved.
 "One of the things that is not in dispute is that he was there. He saw this thing happen. He saw what happened to this man. But he did not participate, he did not aid or abet or encourage or do anything at all to help or assist in any way in killing this man.
 "That was done by Tyrone and Barry. You will hear about those two."
 {¶ 12} In light of these considerations, the trial court concluded that the State did not knowingly withhold T.W.'s identity, allowed the testimony, and determined to offer limiting instructions to minimize the potential for prejudice:
 "[F]irst off, I find that there was no bad faith in the failure to provide this witness' name and proposed testimony to the Defendant. I find that it was through simply a mistake, it was simply missed. I think the Prosecutor is credible with regards to that. It is unfortunate that it has come to this point, but I think in light of the fact that it is being offered for rebuttal testimony, which would be the only way to offer it, and the fact that the defense attorney has had an opportunity to talk to the witness, although the witness wasn't entirely cooperative, and they don't ever have to be entirely cooperative, * * * I am going to, however, limit argument with regards to Mr. Griffin's opening statement, so as to limit what prejudice if any that might be suffered to the Defendant as a result of that opening state[ment].
 "I will also in my closing instructions reiterate to the Jury that the opening statements and arguments of counsel are not evidence and not ever to be considered as such, and as part of that limitation ask that the Prosecutors in their closing arguments refrain * * * from discussing that portion of Mr. Griffin's opening statement, wherein he indicated that Mr. Evans was not there — was there, but did not participate in the offense itself."
 {¶ 13} This Court concludes that the trial court did not abuse its discretion. Defense counsel did not request a continuance or any sanction other than complete exclusion of T.W.'s testimony by objecting "to this witness being used in any form or fashion[.]" Defense counsel was afforded the opportunity to review T.W.'s recorded statement and to meet with T.W. The fact that T.W. chose to be uncooperative is, as the trial court noted, largely unrelated to the timing of the State's disclosure. Thus, while counsel was surprised by the disclosure, he was not *Page 7 
unprepared, and he cross-examined T.W. vigorously. In the context of the other testimony that had been elicited at trial — particularly the eyewitness testimony of James Huff and Barry White, both of whom placed Defendant at the scene holding a firearm immediately before Mr. Smith was shot — it is not apparent that T.W.'s testimony would have forced a change in counsel's trial strategy. Under these circumstances, the trial court did not err by allowing T.W.'s testimony as a rebuttal witness, and Evans' first assignment of error is overruled.
 ASSIGNMENT OF ERROR II "THE TRIAL COURT ERRED IN DENYING THE APPELLANT HIS RIGHT TO A PUBLIC TRIAL UNDER THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION."
 {¶ 14} Evan's second assignment of error is that the trial court erred by closing the courtroom to spectators and requiring that members of the media agree not to publish T.W.'s identity or picture. This Court does not agree.
 {¶ 15} The Sixth Amendment to the United States Constitution and Section 10, Article I, of the Ohio Constitution guarantee the right to a public trial. State v. Lane (1979), 60 Ohio St.2d 112, 119. "The right to a public trial is rudimentary in our judicial system, but, as with most rights, it is not absolute[.]" Id. at 121, citing United States exrel. Smallwood v. LaValle (E.D.N.Y. 1974), 377 F.Supp. 1148. In limited circumstances, a trial court's authority to control the proceedings includes the authority to order closure:
 "The right to a public trial is not absolute, and in some instances must yield to other interests, such as those essential to the administration of justice. A trial judge has authority to exercise control over the proceedings and the discretion to impose control over the proceedings. Nonetheless, the abridgement of a defendant's right to a public trial may occur only when necessary, and any closure must be narrowly drawn and applied sparingly." State v. Drummond, 111 Ohio St.3d 14, 2006-Ohio-5084, at ¶ 51. *Page 8 
When a trial court orders a partial closure of proceedings, there must be a "substantial reason" to justify the closure. Id. at ¶ 53. In addition, "`the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.'" Id. at ¶ 52, quoting Waller v. Georgia (1984),467 U.S. 39, 48. See, also, Drummond at ¶ 54-59.
 {¶ 16} In Drummond, the Ohio Supreme Court acknowledged that "the dangerous nature of gang violence and the genuine need to protect witnesses testifying against gang members from the deadly threat of retaliation" is a substantial interest that justifies partial closure.Drummond at ¶ 54, citing Brown v. Kuhlmann (C.A.2, 1998), 142 F.3d 529,537-38. Other courts have reached similar conclusions when the risk of violence is not overtly gang-related. See, e.g., State v. Scott, 7th Dist. No. 05-MA-215, 2007-Ohio-6258, at ¶ 26 (upholding partial closure in light of an alleged threat to the witness's family members);State v. Grant, 8th Dist. No. 87556, 2007-Ohio-1460, at ¶ 16 (concluding that the trial court did not err by excluding two spectators who had engaged in "stare downs" with prosecutors and from whom witnesses feared retaliation).
 {¶ 17} In this case, the trial court closed the courtroom to all spectators, including Evans' family, except members of the media who agreed to refrain from using T.W.'s name or image in their coverage of the trial. The closure was limited to T.W.'s direct and cross-examination as a rebuttal witness, and the remainder of the four-day trial was open without restriction. As in Drummond, the trial court ordered the partial closure in response to concerns about witness safety. T.W., who was fifteen years old at the time of trial, informed the trial court that although Evans had not made specific threats toward him, he feared for his safety:
 "THE COURT: * * * I have been informed that you have some trepidation, some concern about testifying.
 "[T.W.]: Yes, sir. *Page 9 
 "THE COURT: Can you tell me what your concerns are?
 "[T.W.]: My concerns are, if I say the wrong thing, thinking about me get harmed or my family get harmed.
 "THE COURT: Has anyone made any specific threats to you?
 "[T.W.]: No, sir.
 "* * *
 "THE COURT: So your fear is a general one. What do you base that fear on?
 "[T.W.]: Hearing other people saying about what they going to do to somebody else."
The trial court then permitted the State to question T.W. regarding his fear, also in camera:
 "[THE STATE]: When the Judge asked you a question about, did Willie [Evans] ever threaten to do any harm to somebody else that might cause you fear, when you talked to Willie in the detention home, did he speak about it's that we're against him in this upcoming trial, what we're doing now?
 "[T.W.]: Yes, sir.
 "Q: Do you know James Huff?
 "A: No, I don't. I seen him.
 "Q: Same friends?
 "A: Yes.
 "Q: What did Willie [say] he was going to do to James Huff?
 "A: Beat up or killed.
 "Q: Beat up or killed. And you fear that might happen to you if you were to testify and all those people were in Court?
 "A: Yeah."
The State also examined T.W.'s mother in camera, who shared his fears:
 "Q: Mrs. [W.], you had indicated that you live on * * * [Avenue]. Is that right?
 "A: Yes, ma'am. *Page 10 
 "Q: And since this trial has been going on, have you been at home?
 "A: Yes, sir. Yes, ma'am.
 "Q: And have you heard anything? Have there been discussions near your home regarding what was going [to] happen to one of the witnesses in this case?
 "A: Yes, ma'am.
 "Q: What have you been hearing?
 "A: They said, and I quote, if whenever we see James [Huff], he needs his ass whooped for testifying for saying what he said.
 "Q: Has that caused you some concern?
 "A: Yes, it has. That's why I don't want my son here today."
Upon further examination by defense counsel, Mrs. W. stated that Evans is a relative of her daughter, but not her son, T.W. She agreed that she did not think Evans himself would do harm to T.W., but was unresponsive to defense counsel's inquiry about "other people" who might do so.
 {¶ 18} Defense counsel objected to the partial closure in the absence of a direct threat from, or fear of, Evans himself. Evans argued then — as he has in this appeal — that T.W.'s and Mrs. W.'s fear was inadequate to justify closure and that because neither of them had been directly threatened by anyone from the community, "their fears were not based on reality." This argument, however, ignores the reality demonstrated by the facts of this case. If there is one thing upon which the witnesses to this crime all agreed — including Evans — it is this: that there are consequences to "snitching." Among these youths, there is nothing worse than bearing that label. T.W., a fifteen year-old youth with no involvement in this crime, feared this fate. In the context of this trial, having seen the sometimes disruptive conduct of spectators and having heard the testimony from neighborhood youths up to this point, the trial court rightly concluded that T.W.'s fear for his safety constituted a substantial interest justifying partial closure. *Page 11 
 {¶ 19} The remaining Waller factors supported partial closure in this case as well. With respect to the breadth of the closure, the trial court's decision was appropriately limited in scope: the courtroom was closed only for the direct and cross-examination of one witness and, although all spectators were excluded from the courtroom during T.W.'s testimony, the media was allowed to remain. As the Supreme Court of Ohio concluded in Drummond, the presence of the media acts as a safeguard against violations of the Sixth Amendment. Id. at 55. "Indeed, the witnesses' awareness of the media minimizes the risk that they would alter their testimony when the proceeding was partially closed." Id. Also as in Drummond, the transcript of T.W.'s testimony ultimately became a matter of public record.
 {¶ 20} The exclusion of Evan's family from the courtroom is a matter of more concern. See, e.g., In re Oliver (1948), 333 U.S. 257, 272
("[A]n accused is at the very least entitled to have his friends, relatives and counsel present, no matter with what offense he may be charged."); United States v. Sherlock (C.A.9, 1992), 962 F.2d 1349, 1357
("[W]e do not condone the removal of family members from the courtroom[.]"). But having balanced Evans' rights with T.W.'s legitimate concern for his safety, and in consideration of the very limited scope of the closure in this case, this Court concludes that the exclusion of Evans' family did not violate his right to a public trial. SeeDrummond at ¶ 55.
 {¶ 21} The fourth Waller factor is whether the trial court considered more narrow alternatives to the exclusion. The partial closure of this trial for the examination and cross-examination of a single witness while permitting the media to remain is significantly narrower than full closure. "The trial judge has no further obligation to `consider alternatives to the alternative,' in the absence of any request from the *Page 12 
defendant." Brown v. Kuhlmann (C.A.2, 1998), 142 F.3d 529, 538, quotingAyala v. Speckard (C.A.2, 1998), 131 F.3d 62, 71. See, also,Drummond at ¶ 57.
 {¶ 22} This Court also concludes that the final Waller consideration is present because the trial court made findings sufficient to support its decision. With respect to this factor, "the strength of the judge's actual findings must be evaluated in reference to the limited scope of the closure." Drummond at ¶ 58. The trial court stated:
 "I find based upon the testimony you heard in this case and already on the record as well, as the statements made here in chambers by Mrs. [W.] and her son, that there is a security question here with regards to them and their family. I'm going to order a partial closure of the courtroom, obviously leaving it open to counsel, the parties, those involved specifically with this case. I am going to bring in the representatives of the press, and will allow them to remain in the courtroom so the public can have access to what happened here as long as they agree they are not going to photograph or video tape this witness or print this witness's name in the newspaper. If they choose not to agree to that, then they won't be allowed in the courtroom, in the interest of protecting the safety of this witness and this witness's family, certainly, an important consideration for this Court."
Considering the limited nature of the closure imposed by the trial court and the extensive record made by the parties in camera, these findings were adequate to support closure in this case. See id.
 {¶ 23} The trial court did not err by ordering partial closure of the courtroom in this case during T.W.'s testimony. Evans' second assignment of error is overruled.
 ASSIGNMENT OF ERROR III "APPELLANT'S CONVICTION FOR MURDER UNDER [R.C.] 2903.02(A) WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 24} In his third assignment of error, Evans argues that his conviction for murder is against the manifest weight of the evidence. He has argued that the testimony of the witnesses who identified him as the shooter lacked credibility because those witnesses were biased, *Page 13 
inconsistent, and in some cases, acknowledged liars. Although Evans has not challenged his other convictions, this Court notes that Evans' murder conviction merged into his conviction for aggravated murder for purposes of sentencing. This Court, therefore, considers his third assignment of error with respect to his conviction for aggravated murder in violation of R.C. 2903.01(B).
 {¶ 25} When a defendant asserts that his conviction is against the manifest weight of the evidence,
 "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340.
This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id.
 {¶ 26} Evans was convicted of aggravated murder in violation of R.C. 2903.01(B), which provides that "No person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, terrorism, or escape." R.C. 2901.22(A) explains that "[a] person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."
 {¶ 27} Michael Smith was shot in the abdomen during the course of a robbery outside his home in Lorain. The single gunshot wound was the only injury visible on his body. Mr. Smith's *Page 14 
death resulted from massive internal loss of blood as the bullet tore through the soft tissue in his abdomen, severed a blood vessel that led to the heart, passed through his spinal cord and column, and came to rest just under the skin of his back. The murder weapon has never been found, and Mr. Smith's wallet was not recovered until over a year had passed.
 {¶ 28} Detective Sergeant Mark McCoy of the Lorain Police Department testified that he examined the white Ford Taurus in which Mr. Smith was found for purposes of collecting crime scene evidence. Detective McCoy obtained seven visible full or partial hand prints from the trunk lid and license plate bracket and from the front driver's side fender. Detective McCoy was unable to match the prints to any known subject and entered them into the "Unsolved Latent Database," a computer system that continually scans prints in the database against new samples as they are collected. Several weeks after the murder, the prints obtained from the Taurus were matched to two individuals: five prints to Barry Williams and two prints to Tyrone Young. Willie Evans' prints were not found on the car.
 {¶ 29} Detective Mark Carpentiere interviewed Barry Williams after his prints were matched to those lifted from the Ford Taurus. During the interview, Williams identified an individual known as "Little James" as a potential witness. Detective Carpentiere interviewed James Huff, who had been identified as Little James. He testified that Huff was "hesitant, scared, and reluctant" during their interview. Detective Carpentiere also interviewed Evans, who denied having any knowledge about the shooting and was "disinterested[,] [b]ored" and "yawning" during the interview.
 {¶ 30} The testimony at trial established that four individuals were involved to some degree in the incident that led to Mr. Smith's murder. In addition to Evans, who is nicknamed "Woo," these included Barry Williams, who testified during the State's case-in-chief, Tyrone *Page 15 
"Roney" Young, and Arthur McLemore. Neither Young nor McLemore testified in this proceeding. Evans testified in his own defense. A fifth individual, James Huff, testified that he witnessed the shooting from across the street. Two neighbors, Jennifer Lake and James Norton, testified that they heard the gunshot and witnessed what unfolded after the shooting. On rebuttal, as discussed in our resolution of Evans' first and second assignments of error, Evans' former cell mate testified regarding a conversation he had with Evans after the murder.
 {¶ 31} James Huff was fifteen years old in April 2006. At trial, Huff identified Evans by his nickname "Woo," although he had originally denied knowing Evans by that moniker. According to Huff's testimony, he walked his girlfriend Mari home around midnight, and as the couple walked, Huff noticed three people standing around a car. Huff identified the three people as "Woo, Barry, and Tyrone." Huff testified that he walked Mari partway home, then stopped outside of a business to watch as she walked the rest of the way. He recalled that he headed back toward his home and saw the three men at the car again, "waiting for the dude to get out of the car." Huff identified "the dude" as an "old," "white" man. Huff testified that the man got out of his car and "Willie ran up on him and hit him with the gun, and the dude fell, and then he shot him." He remembered that Evans took the man's wallet and that "Barry [Williams] and Woo" then picked the man up, took him to the back of the car, and put the man in the trunk. Huff recalled that he heard a second shot, but did not see the shooting. He testified that Williams and Evans then ran from the scene. According to Huff, he ran as well. He encountered Young who, according to Huff, looked "scared," and urged him, "[D]on't say nothing. Don't say nothing." Huff testified that he did not see where the three individuals ran. He recalled that Evans was wearing "a brown coat with hair on it * * * [a]round the hoodie." *Page 16 
 {¶ 32} Huff admitted that he did not call the police after witnessing the shooting. He also testified that he saw Evans "smack [Smith] in the head with the gun, and that he witnessed the robbery from a position across the street. He described the victim as "skinny." Huff agreed that his testimony in related proceedings had been different at several points from his testimony at trial. Specifically, he had previously testified that the robbery was already in progress as he walked with Mari; that he did not know which individual hit the victim; and that the three people were "beating up the dude." Huff did not remember seeing Arthur McLemore at the scene of the shooting; he did remember that the gun held by Evans was "silver and little" and appeared to be "a .32."
 {¶ 33} Mr. Huff's testimony on redirect explained why he was reluctant to talk about the crime:
 "Q: You've heard the phrase snitch?
 "A: Yeah.
 "* * *
 "Q: What does it mean to you?
 "A: Snitch? Like it mean something bad to me.
 "Q: It means something bad to you?
 "A: Yeah.
 "Q: In what way? What is bad about it to you?
 "A: What's bad about it? We was from the same hood.
 "Q: When you snitch, what do you do?
 "* * *
 "A: Tell the truth.
 "Q: Okay. And how is that received in your hood, as you put it. *Page 17 
 "* * *
 "A: Get beat up or something."
Huff also testified that he believes it is bad to be a snitch, but not to lie — even in court.
 {¶ 34} Barry Williams, one of the individuals identified by Mr. Huff, also testified. Williams acknowledged that he was facing the same charges as Evans and, although he had not yet completed a plea agreement with the State, expected to do so and to receive a sentence of approximately thirteen years. Williams identified Evans as "Woo" and testified that he had been staying at Evans' home on the date of the murder. He stated that he had known Arthur McLemore his "whole life" and that off the three individuals, Evans, McLemore, and Tyrone Young, he and Tyrone were closest.
 {¶ 35} Williams testified that on the day before the shooting, he, Tyrone, Evans, and McLemore were "just chilling, hanging out" on Long Avenue. Later in the day, according to Williams, Evans suggested that they rob "a dude named Smiles" who lived near 19th and Washington. Smiles, however, was not home. Williams recalled that he believed it would appear suspicious if Smiles came home to find the four young men waiting for him, and he testified that he and Tyrone left the house and walked up Long Avenue, leaving Evans and McLemore behind. Williams and Tyrone returned when they saw headlights approaching Smiles' house. As they neared the area, Williams heard Evans and McLemore "laughing and talking." Williams recalled that he saw "an elderly, Caucasian male. Heavy-set" walking across the street toward a white Ford Taurus. He testified that Evans pulled a gun and gave it to Tyrone, who "took the gun [and] ran up on him." Tyrone ordered the victim to place his hands on the car as he searched his pockets. Thinking that they planned to steal the car, Williams took the keys and got inside as Evans and McLemore stood by laughing. *Page 18 
 {¶ 36} Williams testified that Tyrone told the victim to get in the trunk of the car and the victim pleaded, "You ain't got to put me in the trunk." He recalled that Evans stood behind the trunk, laughing and encouraging Tyrone to put the victim inside. Tyrone "shoved him in the trunk" and tried to close the lid; Williams recalled that he pushed it back open again because the "bar * * * would have mashed his face." Williams admitted that he touched the trunk of the car two times and testified that, at this point, he ran. According to Williams, he turned around briefly as he fled the scene and saw Evans with the gun, standing "two or three steps back" from the car, pointing the gun at the trunk. Williams testified that he heard a single gunshot as he ran away, but did not see the shooting. He also recalled that he encountered Mr. Huff as he ran, who he knew only as James, and who said, "That n***er Woo crazy."
 {¶ 37} Williams testified that he ran to Evans' home, where he had been staying. Tyrone, Evans, and McLemore arrived later in a red sports utility vehicle. Williams recalled that Tyrone had the gun — which Williams identified as a 9mm — but that no one had the victim's wallet. According to Williams, he faced Evans' anger for running away:
 "Q: Did you speak to Willie Evans about what had happened on 18th Street at that time?
 "A: Not really. I was just like, I hope you don't do nothing stupid, because my fingerprints is on that car.
 "Q: Did Willie say anything to you?
 "A: No. He was just like, stop being scared. Stop acting like a punk for real.
 "And Tyrone had the gun. He was like, you might as well shoot him, because he is the one that is going to snitch on everybody.
 "Q: And did Tyrone shoot you?
 "A: No, he didn't.
 "Q: Okay. Did he stick up for you? *Page 19 
 "A: Yeah. He said no, that's my dude. He cool. He ain't gonna say nothing."
Williams admitted that he had originally told a different story to the police that omitted Tyrone's involvement in the robbery because "out of all of us, me and Tyrone was cool, and he always look out for me. I didn't want to get him involved with it. I just wanted to make sure you all knew I didn't do [sic] and who did."
 {¶ 38} Williams denied that his testimony was motivated by the expectation of a plea agreement and denied that he had told a cellmate or anyone else that he was the shooter. He admitted that he had been using marijuana in April 2006 and that a warrant had issued for his arrest immediately before the shooting because he provided a false address to the court when he posted bond on an unrelated offense.
 {¶ 39} Henry Cook, a witness called on behalf of the defense, contradicted portions of Williams' testimony. Specifically, he testified that he discussed the murder with Williams while the two were incarcerated and recalled that Williams "told me he killed the man" because "Tyrone said his name" during the robbery. Cook stated that he wrote a letter to Evans to tell him about Williams' admission because he wanted to help out a friend. He did not inform the police or the prosecuting attorney. Cook admitted that he has an extensive criminal record of his own.
 {¶ 40} Evans, who testified in his own defense, described a similar series of events, but placed responsibility for the planned robbery of Smiles and the shooting of Mr. Smith on Williams. According to his testimony, he was with Tyrone, Williams, and McLemore prior to the shooting. Evans testified that Williams suggested robbing Smiles, but that he tried to talk Williams out of it because he knew Smiles and knew that he didn't have much money or drugs. Evans recalled that the group split in two at this point, with Evans and McLemore making plans *Page 20 
to visit their grandmother while Tyrone and Williams carried out their plan to break into Smiles' house. When Evans and McLemore learned that their grandmother had gone to bed for the evening, they walked down 18th Street instead. Evans testified that as they approached they saw a white car with an open trunk parked at the side of the road and McLemore noticed that Williams was robbing someone. Evans testified that he saw Williams "patting him down" while Tyrone was "standing there with him" holding a gun. According to Evans, he and McLemore "took off" and heard one shot as they approached the intersection of 18th and Long Avenue. Evans testified that he saw Tyrone running when he glanced around.
 {¶ 41} Evans admitted that he lied to police during initial interviews. He testified that Williams had admitted that he shot Mr. Smith because Tyrone had used Williams' name during the course of the robbery. Evans also testified that he had requested a polygraph examination and insisted that he had told the truth during the test. He attributed his three failing scores to the fact that the polygrapher made him feel "disrespected."
 {¶ 42} Because Evans requested a polygraph examination and stipulated that the results would be admitted at trial, the State called Bill Evans as a witness in its case-in-chief. Mr. Evans administered a polygraph examination to Willie Evans on September 4, 2007, at the Lorain County Jail. Mr. Evans described in detail the process that he uses to develop relevant control and examination questions based on his interview with the subject and described the physiological responses measured by polygraphy equipment. According to Mr. Evans, he administered three successive tests to Willie Evans, who "reacted in each of the parameters" measured by the test and whose physiological responses indicated deception each time.
 {¶ 43} Two of Mr. Smith's neighbors also testified. Jennifer Lake, who lived diagonally across the street from Mr. Smith's home, testified that she was standing at her kitchen sink doing *Page 21 
dishes shortly after midnight on April 13, 2006. She recalled that she "heard a pop" and then "heard a man moaning outside." Ms. Lake called the police, then went outside. She remembered finding Mr. Smith: "I seen the man that I see all the time on his porch across the street, mowing his lawn, he was in the trunk of the car." Ms. Lake testified that the front driver's side door of the car had been left open.
 {¶ 44} James Norton lived at 1928 Long Avenue, and shortly after midnight he was smoking near an open window in his home. He "heard two loud pops," then looked out the window:
 "I looked out my side window, and observed two guys running through my driveway and heard the chain link fence in the back jingling.
 "* * *
 "So I went downstairs and looked to see where they went, an[d] they went one house over from me.
 "And I observed two people sitting on the porch, and one came out of the house and he had a cordless phone, not a cell phone, but a cordless phone. And then shortly after that a maroon truck pulled up a loud exhaust with a temporary tag on it, broken back window, and he, the suspect jumped into, or the guys jumped into the truck and they drove off."
Mr. Norton clarified that he saw two individuals running through his driveway and that he heard a third opening the chain link fence in his backyard. He recalled that one person was wearing a yellow jacket "like a school bus" and one wore "a black coat with like fur around it[.]"
 {¶ 45} T.W. testified during the State's rebuttal. He admitted that he had a conversation with Lieutenant Roher on September 28, 2006, and that during that conversation, he made truthful statements about a conversation that he had with Willie Evans while the two youths were detained in a juvenile facility. T.W. conceded that he did not remember everything that he said during the interview with Lieutenant Roher. At trial, T.W. testified that Evans told him about a man in the trunk of a car and described "what he was being charged with." T.W. denied, during *Page 22 
his testimony at trial, that Evans had told him whether he shot that man or why he was shot. He testified that Evans did comment on James Huff, and stated that "[h]e was a snitch" and "he think he should be harmed or killed" for "snitching" on Evans. After having his recollection refreshed by watching a videotape of his September 2006 interview, T.W. affirmed that he had told Lieutenant Roher a different story. Specifically, he testified that he told Lieutenant Roher that Evans admitted shooting Mr. Smith and putting him in the trunk of the car because "the man was running off at the mouth."
 {¶ 46} T.W. acknowledged that his September 2006 interview occurred because he had been arrested on a probation violation; that he had been confined in the juvenile detention facility for "[g]un specs and burglaries"; and that he lied to Lieutenant Roher "about my burglaries" during the interview. T.W. denied, however, that he lied to Lieutenant Roher about Evans' involvement in the murder and stated that he received no consideration for his information with respect to his own juvenile charges.
 {¶ 47} This Court has reviewed the record in this case, including the reasonable inferences that may be drawn from the witnesses' testimony, and has considered the credibility of those who testified at trial. In this respect, we note that all of those who witnessed this shooting had a motive to lie and, in fact, admitted to having done so at some point in the proceedings. This Court is persuaded, however, that this is not the exceptional case in which the evidence weighs so heavily in favor of the defendant that a new trial is warranted. Evans' third assignment of error is overruled.
 ASSIGNMENT OF ERROR IV "APPELLANT WAS NOT AFFORDED THE EFFECTIVE ASSI[S]TANCE OF TRIAL COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION." *Page 23 
 {¶ 48} Evans' final assignment of error is that was denied effective assistance of trial counsel because his attorney (1) stipulated to the admission of a polygraph examination and (2) requested a complicity instruction from the trial court. We disagree.
 {¶ 49} This Court analyzes claims of ineffective assistance of counsel under a standard of objective reasonableness. See Strickland v.Washington (1984), 466 U.S. 668, 688; State v. Bradley (1989),42 Ohio St.3d 136, 142. Under this standard, a defendant must show deficiency in the performance of counsel "so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment" and that the errors made by counsel were "so serious as to deprive the defendant of a fair trial[.]" Strickland, 466 U.S. at 687. In applying this test, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" Id. at 689. Trial strategy "must be accorded deference and cannot be examined through the distorting effect of hindsight."State v. Conway, 109 Ohio St.3d 412, 2006-Ohio-2815, at ¶ 115. A defendant must demonstrate prejudice by showing that, but for counsel's errors, there is a reasonable possibility that the outcome of the trial would have been different. Strickland, 466 U.S. at 694. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Id. at 691.
 THE POLYGRAPH TEST {¶ 50} The results of a polygraph examination may be admitted in a criminal trial provided, among other things, that "[t]he prosecuting attorney, defendant and his counsel * * * sign a written stipulation providing for defendant's submission to the test and for the subsequent admission at trial of the graphs and the examiner's opinion thereon on behalf of either defendant or the state." State v. Souel (1978),53 Ohio St.2d 123, paragraph one of the syllabus. *Page 24 
 {¶ 51} When a defendant challenges counsel's effectiveness with respect to a polygraph stipulation, courts consider the circumstances surrounding the stipulation and the evidence ultimately admitted at trial to determine whether the Strickland requirements are satisfied. See, e.g., State v. Fisk, 10th Dist. No. 01AP-1193, 2002-Ohio-2776, at ¶ 75-87 (considering whether a polygraph stipulation is signed by all parties, is carefully drafted, and clearly sets forth the implications of testing; the thoroughness of counsel's cross-examination; and the fact that the defendant "willingly agreed [to] if not insisted upon" the polygraph). When these circumstances indicate compliance withSouel and vigorous cross-examination by trial counsel, a determination of ineffective assistance is not warranted:
 "Were we to deem `deficient' counsel's joining his client in this stipulation, such holding would be tantamount to negating all such stipulations. The consequence of such a finding would not only render such stipulations meaningless; it would potentially mandate a finding of `deficient performance per se' by any defense attorney who accedes to the stipulation at the behest of his client." Fisk at ¶ 87.
Accordingly, the decision to enter into a stipulation regarding the admission of a polygraph is a trial strategy that does not amount per se to ineffective assistance of counsel. See State v. Williams, 5th Dist. No. 05-CA-36, 2006-Ohio-1381, at ¶ 71-72.
 {¶ 52} App. R. 9 imposes a duty on the appellant to provide this Court with all parts of the record necessary to demonstrate the errors assigned on appeal. See State v. Williams, 9th Dist. No. 23560,2008-Ohio-1048, at ¶ 10. This Court notes that while the fact of Appellant's stipulation to the polygraph is obvious from the record in this appeal, the stipulation itself is not contained in the record. It is apparent, however, that the polygraph was administered on Appellant's initiative:
 {¶ 53} "[THE STATE]: I did not come to Mr. Evans and ask him to take the polygraph. Mr. Evans' attorney called me three times over the weekend. I called him back. I had to go to my boss on two occasions. *Page 25 
 "* * * This is highly unusual, [I] did not want to give him a polygraph. He insisted on having it since the other people had taken it. He knew the results.
 "* * *
 "[DEFENSE COUNSEL]: [The prosecuting attorney] met me at the jail and provided me a copy of the polygraph.
 "* * *
 "I talked to Willie, I reviewed that with him, and explained to him the risks, the benefits of a polygraph. I explained to him other people had passed the polygraph on the issue of him being the shooter, it would be unlikely he would pass a polygraph on that issue. I explained to him if he failed it, it would come into evidence. I went over in this great detail with him.
 "* * * Then we left and came back later on that afternoon so he could think about it, I think he might have talked to his folks.
 "When we came back that afternoon I asked him again, is this something you for sure want to do? And he said yes, he did."
Defense counsel vigorously cross-examined the polygrapher with respect to his methodology, the reliability of polygraphs in general, and the conduct of the examination in this case. Even without the benefit of reviewing the stipulation, therefore, this Court concludes that the polygraph stipulation was not error on the part of trial counsel. Appellant has failed to demonstrate that the first prong of theStrickland test is met with respect to the polygraph examination.
 THE COMPLICITY INSTRUCTION {¶ 54} Appellant also maintains that trial counsel was ineffective because his proposed jury instructions contained a complicity instruction which, according to Appellant, "effectively gave the jury a way to find Mr. Evans guilty of murder if they believed that he aided and abetted in the commission of the crime." This Court disagrees.
 {¶ 55} Trial counsel's decisions regarding jury instructions are matters of trial strategy that, even if debatable, do not constitute ineffective assistance of counsel. See Conway, 2006-Ohio-2815, *Page 26 
at ¶ 111. In this case, trial counsel's proposed jury instructions included limitations on complicity that served his client's interests:
 "To aid means to help, assist, or strengthen another person.
 "To abet means to encourage, to counsel, to incite or to assist another person.
 "Before one can be found guilty of an offense on the basis of his or her complicity, it must be proven that the one in complicity was aware of the design or purpose of the principal offender and shared in the knowledge held by the principal.
 "A person cannot be found guilty of an offense on the basis of complicity unless that offense was actually committed.
 "The mere presence of an accused at the scene of a crime is not sufficient to prove in and of itself that the accused was an aider or abettor."
In the context of this case, in which Appellant testified that he witnessed, but did not participate in, a portion of the events that led to Mr. Smith's death, this Court cannot conclude that trial counsel's proposed jury instructions amounted to ineffective assistance of counsel. Appellant's fourth assignment of error is overruled.
 IV. {¶ 56} Appellant's assignments of error are overruled. The judgment of the trial court is affirmed.
Judgment affirmed.
 The Court finds that there were reasonable grounds for this appeal. *Page 27 
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to Appellant.
CARR, P. J., WHITMORE, J., CONCUR.
(Baird, J., retired, of the Ninth District Court of Appeals, sitting by assignment pursuant to, § 6(C), Article IV, Constitution.) *Page 1