**[Cite as *State v. Carter*, 2022-Ohio-1444.]**

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,              CASE NO.  1-21-19

      v.

TERREZ L. CARTER,                O P I N I O N

      DEFENDANT-APPELLANT.

STATE OF OHIO,

      PLAINTIFF-APPELLEE,              CASE NO.  1-21-20

      v.

TERREZ L. CARTER,                O P I N I O N

      DEFENDANT-APPELLANT.

**Appeals from Allen County Common Pleas Court**
**Trial Court Nos. CR2018 0275 and CR2018 0187**

**Judgments Affirmed**

**Date of Decision:   May 2, 2022**

APPEARANCES:

      *William T. Cramer* **for Appellant**

      *Jana E. Emerick* **for Appellee**

Case Nos. 1-21-19, 1-19-20

**SHAW, J.**

{¶1} Defendant-appellant, Terrez L. Carter ("Carter"), brings this appeal from the April 19, 2021 judgment entries of the Allen County Common Pleas Court sentencing him to an aggregate 36-year prison term. Carter was convicted in trial court case CR2018 0275 of five counts of rape in violation of R.C. 2907.02(A)(2), all first degree felonies, and he was convicted in trial court case CR2018 0187 of possession of cocaine in violation of R.C. 2925.11(A), a first degree felony, and having weapons while under disability in violation of R.C. 2923.13(A), a third degree felony. On appeal, Carter argues that the trial court erred by joining the cases for trial, that the trial court erred by closing the courtroom temporarily to show the jury a video of one of the rape victims, and that the rape convictions were against the manifest weight of the evidence.

### Background

{¶2} S.S. claimed that Carter raped her orally, anally, and vaginally at Carter's residence on April 19, 2018. She claimed that Carter told her she could not leave until he got what he wanted, and that Carter threatened her, saying he should beat her and put her in a body bag.[1]

---

[1] Carter challenged S.S.'s version of events and her credibility, particularly due to her cocaine use and her prior text exchanges with Carter. These issues will be discussed *infra* in Carter's weight of the evidence challenge.

{¶3} After the incidents, S.S. called her friend and then went to the hospital. She was evaluated by a Sexual Assault Nurse Examiner ("SANE"). The SANE observed bruising on S.S.'s leg, neck, and abdomen. The SANE also observed a four millimeter cut on S.S.'s vaginal wall, skin tears in the vaginal and perianal region, and redness/swelling of S.S.'s cervix. The SANE testified that she would not expect to see tearing to that degree with a consensual encounter. Swabs were collected from S.S. and DNA consistent with Carter was found on the swabs.

{¶4} Although initially reluctant, S.S. told her story to law enforcement. Subsequently, a search warrant was obtained for Carter's residence. At Carter's residence police located, *inter alia*, in excess of 60 grams of cocaine and a firearm.

{¶5} S.S. was eventually contacted by another woman, S.H., who claimed Carter had held her against her will and raped her in 2015.[2] S.H. dated Carter for over a year and had consensual encounters with him; however, around June of 2015, S.H. detailed an incident that occurred over multiple hours wherein Carter got physical with her after an argument and forced her to have vaginal, anal, and oral sex with him, all allegedly while Carter had a firearm.

{¶6} S.H. believed that there might have been some video evidence of the incident, as she recalled Carter recording the matter. Police checked a SIM card

---

[2] Carter also challenged S.H.'s credibility, particularly given the fact that the week before the trial she spoke to Carter on the phone and was intoxicated while doing so, despite professing her sobriety initially in her testimony. Again, these issues will be discussed *infra* in Carter's weight of the evidence challenge.

that had been taken during the search of Carter's residence, and found videos of S.H. The videos depicted S.H. undressed, stating she did not want to be on video. Further, on the video, Carter repeatedly told S.H. to "open her legs" and she refused. At one point Carter says that he is going to "forcefully" open her legs, but he was not going to "rape her." (State's Ex. 61). Later, Carter records himself digitally penetrating S.H. while she cries. As he performs the act, he says things like S.H. was crying because she "love [sic] it." (*Id.*)

**{¶7}** On June 13, 2018, Carter was indicted in trial court case CR2018 0187 with possession of cocaine in violation of R.C. 2925.11(A), a first degree felony, and having weapons while under disability in violation of R.C. 2913.23(A)(3), a third degree felony.[3]

**{¶8}** On July 12, 2018, another indictment was filed against Carter in trial court case CR2018 0275. He was accused of three counts of rape of S.S. in violation of R.C. 2907.02(A)(2), all first degree felonies (Counts 1-3), kidnapping of S.S. in violation of R.C. 2905.01(A)(2), a first degree felony (Count 4), three counts of rape of S.H. in violation of R.C. 2907.02(A)(2), all first degree felonies and all containing firearm specifications pursuant to R.C. 2941.145(A) (Counts 5-7), and kidnapping of S.H. in violation of R.C. 2905.01(A)(2), a first degree felony (Count 8).[4]

---

[3] The possession of cocaine charge carried an accompanying firearm specification pursuant to R.C. 2941.141(A), but that specification was later dismissed.

[4] There were additional counts in the original indictment filed on July 12, 2018, but the additional counts were ultimately dismissed and the indictment was renumbered into the form cited herein.

{¶9} Carter entered pleas of not guilty to all charges in both indictments. During the pretrial process, the State moved to consolidate the two cases for trial. Carter opposed the request and a hearing was held, but ultimately the trial court granted the State's request for consolidation in a written entry.

{¶10} Following extensive pretrial motion practice, wherein Carter went through five attorneys, some appointed, some retained, the cases proceeded to a jury trial. Both alleged victims testified at trial as well as various law enforcement officers who investigated the incidents. In addition, the SANE testified as did some individuals who knew the victims and the defendant. Carter's trial counsel cross-examined the witnesses and called multiple witnesses in his case-in-chief, who testified to, *inter alia*, S.H.'s drug use and her "toxic" relationship with Carter. Carter's counsel repeatedly challenged the credibility of the alleged victims, painting them as drug users who engaged in consensual encounters with Carter.

{¶11} Ultimately the jury convicted Carter of possession of cocaine and having weapons while under disability as charged in trial court case CR2018 0187. With regard to trial court case CR2018 0275, Carter was found guilty of all three rapes of S.S. (Count 1-3), kidnapping of S.S. (Count 4), two rapes against S.H. (Counts 5 and 7), and kidnapping of S.H. Carter was acquitted of one rape against S.H. (Count 6), and he was acquitted of the firearm specifications accompanying Counts 5 and 7.

{¶12} On April 19, 2021, Carter's case proceeded to sentencing. In trial court case CR2018 0187, Carter was sentenced to serve 11 years in prison on the possession of cocaine charge, and 36 months in prison on the having weapons while under disability charge, consecutive to each other.

{¶13} In trial court case CR2018 0275, the trial court determined that the kidnapping charges related to each victim would merge with the rape charges related to each victim. The State elected to proceed to sentencing on the rape charges. Carter was then ordered to serve 11 years in prison on each of the five rape convictions. The three rape convictions against S.S. were ordered to be served concurrently with each other, and the two rape convictions against S.H. were ordered to be served concurrently with each other. However, the sentence for the rape against S.S. and the sentence for the rape against S.H. were ordered to be served consecutive to each other, and consecutive to the sentence imposed in trial court case CR2018 0187. Carter was thus sentenced to serve an aggregate 36-year prison term.

{¶14} Judgment entries memorializing Carter's convictions were filed April 19, 2021. It is from these judgments that Carter appeals, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**Appellant's due process right to a fair trial was violated by the prejudicial joinder of multiple offenses for trial.**

**Assignment of Error No. 2**
**Appellant's Sixth Amendment right to a public trial was violated when the trial court closed the courtroom for a portion of the evidence.**

**Assignment of Error No. 3**
**The weight of the evidence did not support the guilty verdicts based [S.S.]'s allegations.**

**Assignment of Error No. 4**
**The weight of the evidence did not support the guilty verdicts based on [S.H.]'s allegations.**

*First Assignment of Error*

{¶15} In his first assignment of error, Carter argues that the trial court erred by permitting a joint trial for both rape victims despite the fact that the alleged rapes occurred years apart.

Relevant Authority

{¶16} Criminal Rule 8(A) sets forth the circumstances under which multiple offenses may be joined in a single indictment. Pursuant to that rule, two or more offenses may be charged in the same indictment if they are "of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Crim.R. 8(A).

{¶17} Importantly, " '[t]he law favors joining multiple criminal offenses in a single trial.' " *State v. Gordon*, 152 Ohio St.3d 528, 2018-Ohio-259, ¶ 18, quoting *State v. Franklin*, 62 Ohio St.3d 118, 122 (1991). This is because joinder "conserves

judicial and prosecutorial time, lessens the not inconsiderable expense of multiple trials, diminishes inconvenience to witnesses, and minimizes the possibility of incongruous results in successive trials before different juries." *State v. Thomas*, 61 Ohio St.2d 223, 225 (1980); *State v. Hamblin*, 37 Ohio St.3d 153, 157-58 (1988).

{¶18} Notwithstanding the policy favoring joinder, an accused may move pursuant to Crim.R. 14 to sever counts of an indictment on the grounds that he or she will be prejudiced by the joinder of multiple offenses. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶ 49. To obtain severance pursuant to Crim.R. 14, the *accused* bears "the burden of affirmatively showing that his rights were prejudiced; he must furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial[.]" *State v. Torres*, 66 Ohio St.2d 340, 343 (1981), syllabus.

{¶19} However, the State can "refute a defendant's claim of prejudicial joinder" by demonstrating either of the following: (1) that the evidence to be introduced relative to one offense would be admissible in the trial on the other, severed offense, pursuant to Evid.R. 404(B) (the "other acts" test); or (2) that, regardless of the admissibility of such evidence, the evidence relating to each charge is simple and direct (the "joinder test"). *State v. Powell*, 8th Dist. Cuyahoga No. 107276, 2019-Ohio-4345, ¶ 74; *Franklin* at 122. Importantly, the two tests are disjunctive—the satisfaction of one negates an accused's claim of prejudice *without*

-8-

*consideration of the other.* *State v. Truss*, 10th Dist. Franklin No. 18AP-147, 2019-Ohio-3579, ¶ 17.

{¶20} Trial courts have considerable latitude in determining whether severance is warranted and we will not reverse a trial court's decision to deny severance absent an abuse of discretion. *Id.* at ¶ 18. A trial court abuses its discretion when its ruling is "unreasonable, arbitrary, or unconscionable." *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

Analysis

{¶21} In this case, the alleged rapes of S.S. and the alleged rapes of S.H. were included in the same indictment. The State later requested that the indictment containing the rape charges and the indictment containing the cocaine/weapon possession charges be joined for trial. Carter opposed the State's request for joinder of the two separate cases *and* he moved to sever the indictment in CR2018 0275, seeking to have the rape charges related to each alleged victim tried individually.

{¶22} In a written entry, the trial court granted the State's joinder request and denied Carter's severance request based on the following reasoning:

> **Here, after reviewing the discovery filed electronically in the respective cases, the statements of defendant and the Bill of Particulars, the Court finds that the facts of the charged offenses in the respective cases are relatively straightforward and relate to alleged uncomplicated factual allegations of rape, kidnapping, possession of drugs and having weapons while under disability. The charges are either of the same or similar character (the rapes & kidnappings), and/or are based upon two or more acts or**

> **transactions connected together or part of an alleged common scheme or course of criminal conduct to engage in rapes, kidnapping and drug/weapon possession in Allen County. The Court will instruct the jury to consider all counts separately and uninfluenced by their decision on other counts [OJI-CR 425.07]. A jury is believed "capable of segregating the proof on multiple charges when the evidence as to each of the charges is uncomplicated." *State v. Brooks*, 44 Ohio St.3d 185, 193 (1989). Defendant has not demonstrated sufficient information to show joinder violates his right to a fair trial.**

(CR2018 0275 Doc. No. 74). Following the trial court's ruling, Carter's cases proceeded to trial on the rapes of both alleged victims and the possession/weapon charges in CR2018 0187.

{¶23} Carter argues that the trial court abused its discretion by denying his request to sever the indictment. Specifically, he contends that, "Both alleged [rape] victims had serious credibility issues, but by trying them together, the separate allegations served to bolster each other through corroboration." (Appt.'s Br. at 17). Carter argues that the multiple incidents that were prejudicially joined for trial would *not* have been admissible in separate trials on each individual rape incident under Evid.R. 404(B). Further, he claims that the evidence of each incident was not separate and distinct.

{¶24} Importantly, as noted above, the two tests for refuting an accused's claim of prejudice regarding joinder are disjunctive. Thus, "[i]f the state can meet the joinder test, it need not meet the stricter 'other acts' test." *State v. Johnson,* 88 Ohio St.3d 95, 109 (2000). Generally, "Evidence meets the simple-and-direct

standard [of the joinder test] if it is straightforward and uncomplicated enough that the jury can segregate the proof required for each offense." *State v. Parham,* 10th Dist. Franklin No. 16AP-826, 2019-Ohio-358, ¶ 27, citing *State v. Clinton,* 153 Ohio St.3d 422, 2017-Ohio-9423, ¶ 52.

{¶25} In *State v. Woodruff*, 1st Dist. Hamilton No. C-140256, 2015-Ohio-2422, ¶ 14-15, the First District Court of Appeals analyzed a challenge similar to Carter's and found the evidence to be simple and direct on the following basis:

> **As we understand the second part of the joinder test, the focus is not on the emotional impact of the evidence but on the potential for juror confusion. We cannot presume that just because evidence may garner a strong emotional response that jurors are incapable of segregating the evidence in their minds.**
>
> **Applying the traditional standard, Mr. Woodruff was not prejudiced by joinder because the evidence of each offense was separate and distinct. B.W. testified about one discrete incident with Woodruff, while K.C. was able to describe at least three incidents. The girls were very clear about where the incidents had occurred and what Woodruff had done. The evidence of the offenses involving the four photographs was likewise separate and uncomplicated. The jury could segregate proof for each offense. Further, the court instructed the jury to consider each count separately. The court did not abuse its discretion in denying Woodruff's motion for severance.**

{¶26} Here, similar to the *Woodruff* case, the jury was presented with S.S.'s testimony regarding her 2018 rapes, and S.H.'s testimony regarding her 2015 rapes. The evidence detailed where the incidents occurred and what Carter had purportedly done. There is no indication that the jury was unable to segregate proof in this

matter, or that the testimony was anything other than simple and direct. Notably, similar to the holding in *Woodruff*, Ohio Appellate Courts have repeatedly found no abuse of discretion where sexual assault charges against different victims were joined for trial after determining that the evidence of each case was separate and distinct. *See State v. Gideon*, 3d Dist. Allen Nos. 1-18-27, 1-18-28, 1-18-29, 2021-Ohio-1863, ¶ 13; *State v. Ashcraft*, 12th Dist. Butler No. CA2008-12-305, 2009-Ohio-5281, ¶ 27; *State v. Echols*, 8th Dist. Cuyahoga No. 102504, 2015-Ohio-5138, ¶ 15.

{¶27} Moreover, the jury acquitted Carter of one count of rape against S.H., finding that the State had not proven beyond a reasonable doubt that Carter engaged in the anal rape of S.H. as alleged by the State. Carter was also acquitted of multiple firearm specifications. Courts have held that an acquittal on one charge reflects the jury's ability to segregate the proof in each case, further establishing that evidence in this matter was simple and direct. *State v. Powell*, 8th Dist. Cuyahoga No. 107276, 2019-Ohio-4345, ¶ 78, citing *State v. Lee*, 8th Dist. Cuyahoga No. 104682, 2017-Ohio-1449, ¶ 19 (the evidence was "simple and direct" as reflected by the jury acquitting the defendant of offenses relating to one of the several shootings); *State v. Bonneau*, 8th Dist. Cuyahoga No. 97565, 2012-Ohio-3258, ¶ 22 (the jury's not guilty verdict as to the counts relating to one victim and its guilty verdicts as to the

counts relating to another demonstrated that the jury was able to separate the evidence and considered each victim separately).

{¶28} Notwithstanding the acquittals, the jury also was explicitly instructed in this case to consider each count and the evidence applicable to each count separately, and uninfluenced by the verdict related to any other count. For all these reasons we cannot find that the trial court abused its discretion in this case.

{¶29} Given that we have determined that the trial court did not abuse its discretion by finding that the "joinder test" was met here, we need not proceed to address the "other acts" argument with regard to the rape charges being presented in the same trial. However, to the extent that the "other acts" argument is related to the *drug/weapon* charges in CR2018 0187 being joined with the rape charges in CR2018 0275, the trial court specifically determined that the drugs and firearm were only uncovered during the investigation of S.S.'s rape. In addition, both victims admitted to being drug users, tying drugs to the rapes. The trial court found that these issues made the drug charge admissible in the rape trials, and we can find no abuse of discretion with that determination.

{¶30} Finally, as with the sexual assault charges, the evidence was also simple and direct related to the drug and firearm possession, as emphasized by the jury's acquittals on some charges, in particular firearm specification acquittals. For all of these reasons, Carter's first assignment of error is overruled.

*Second Assignment of Error*

**{¶31}** In his second assignment of error, Carter argues that the trial court erred by closing the courtroom to spectators briefly while State's Ex. 61 was played for the jury. He argues that this closure violated his right to a public trial.

Relevant Authority

**{¶32}** The Sixth Amendment to the U.S. Constitution and Article I, Section 10 of the Ohio Constitution guarantee the right to a public trial. *State v. Lane,* 60 Ohio St.2d 112, 119 (1979). "The right to a public trial is rudimentary in our judicial system, but, as with most rights, it is not absolute * * *." *Id.* at 121. However, it is within the authority of a trial court to order the closure of the proceedings in limited instances. *State v. Evans,* 9th Dist. Lorain No. 07CA009274, 2008-Ohio-4295, ¶ 15. In those limited instances the right to a public trial:

> **must yield to other interests, such as those essential to the administration of justice. A trial judge has authority to exercise control over the proceedings and the discretion to impose control over the proceedings. Nonetheless, the abridgement of a defendant's right to a public trial may occur only when necessary, and any closure must be narrowly drawn and applied sparingly.**

*State v. Drummond,* 111 Ohio St.3d 14, 2006-Ohio-5084, ¶ 51.

**{¶33}** When a trial court orders a partial closure of proceedings, there must be a "substantial reason" to justify the closure. *Id.* at ¶ 53. In addition, "'the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make

-14-

findings adequate to support the closure.'" *Id.* at ¶ 52, quoting *Waller v. Georgia*, 467 U.S. 39, 48, 104 S.Ct. 2210.

**{¶34}** When a trial court does exclude spectators from the courtroom, we review the trial court's decision under an abuse of discretion standard. *State v. Howse*, 9th Dist. Lorain No. 12CA010251, 2012-Ohio-6106, ¶ 6. Importantly, however, the violation of the right to a public trial is considered structural error and not subject to harmless-error analysis. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, ¶ 50, citing *Waller* at fn. 9 (1984). A structural error is a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246 (1991).

Analysis

**{¶35}** In this case, prior to the brief courtroom closure, S.H. was testifying regarding the 2015 incidents wherein her liberty was restrained and she was sexually assaulted by Carter. S.H. testified that during the incident, Carter used a video camera and recorded himself digitally penetrating her. She told Carter that she did not want to be on film but Carter filmed her anyway. She testified that Carter "fingered" her on the film, that she did not consent to it, but she allowed him to do it because she wanted him to calm down.

**{¶36}** Following this testimony, the State sought to play the video recording that S.H. referenced. The State requested that the courtroom be cleared of everyone but the jury, the prosecution, and the defendant due to the graphic and sensitive nature of the videos. Carter objected to the courtroom closure, claiming it was a public trial.

**{¶37}** The trial court ultimately granted the State's request for temporary closure of the courtroom, noting Carter's objection. The court reasoned that

> **because of the nature of the videotapes, and the record should reflect the Court has already seen these before the hearing, because of the nature the Court is going to have the Courtroom cleared other than the jurors, obviously, who will stay in. Once the videos are played we'll probably be taking a break shortly thereafter and then everybody else can come into the Courtroom. So, other than the jurors the Court would order that because of the sensitive nature and the graphic nature of the videos that the Courtroom will be cleared. So, everybody audience, please – counsel's staff can stay.**

(Tr. at 500-501).

**{¶38}** After the trial court's ruling, the record reflects that "the general public" was cleared from the courtroom. Thereafter the State played three video clips from State's Exhibit 61, which were contained on a flash drive. No questions were asked while the videos were played.

**{¶39}** After the video clips were played, the trial court took a recess and the trial reconvened with the public in attendance. The prosecutor then resumed asking S.H. questions about the videos that were viewed in the absence of the public.

**{¶40}** Carter now contends that the trial court abused its discretion by ordering the temporary courtroom closure because the State did not show a substantial reason for closure, because the trial court did not narrowly tailor the closure and consider alternative remedies, and because the trial court did not make adequate findings to support the closure.

**{¶41}** Contrary to Carter's arguments, the State mentioned the sensitive nature of the videos, providing reasoning for a partial, temporary closure. The trial court itself had viewed the videos, and found them to be sensitive and graphic. Moreover, the trial court limited the closure to *only* the time wherein the videos were being played. The trial court thus effectively addressed the appropriate factors in this matter when making its determination on partial, temporary courtroom closure and for this reason alone we could find no abuse of discretion.

**{¶42}** However, we would emphasize again that no questions were asked of S.H. while the videos were being played and while the public was briefly excluded from the courtroom. S.H. was questioned about the events on the video both before and after the courtroom closure, but not during. Thus spectators were not prevented from hearing *any* of S.H.'s testimony.[5]

---

[5] As these were video clips being played for a jury in a courtroom, it is not even clear to what degree spectators would have been able to see *or* hear the video clips since we do not know how the clips were being shown to the jurors.

**{¶43}** While closure of courtrooms to the public, and particularly the media, should only be done in very limited circumstances, Ohio Appellate Courts have upheld closures for such issues as safety concerns for a witness. *State v. Bragg*, 10th Dist. Franklin No. 05AP-100, 2006-Ohio-1903, ¶ 29.[6] Here, the trial court narrowly tailored a courtroom closure for a very small portion of the trial, which included no actual testimony. Under the specific facts and circumstances of this case, we cannot find that the trial court abused its discretion. Therefore, Carter's second assignment of error is overruled.

*Third Assignment of Error*

**{¶44}** In Carter's third assignment of error, he argues that his convictions related to S.S. were against the manifest weight of the evidence.

Standard of Review

**{¶45}** In reviewing whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52. In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created

---

[6] Although this was not necessarily a safety concern, we cannot find that the trial court abused its discretion by determining that privacy was a valid concern.

such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id*.

**{¶46}** Nevertheless, a reviewing court must allow the trier-of-fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

Controlling Statutes

**{¶47}** Carter was convicted of three counts of rape of S.S. in violation of R.C. 2907.02(A)(2), which reads, "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

**{¶48}** The jury also found Carter guilty of Kidnapping in violation of R.C. 2905.01(A)(2), which reads:

> **(A)  No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:**
>
> **\* \* \***

**(2) To facilitate the commission of any felony or flight thereafter[.]**[7]

Testimony Regarding the Rapes and Kidnapping of S.S.

**{¶49}** S.S. testified that she met Carter through a mutual friend a few months before April of 2018. S.S. knew Carter as "Peanut" and she testified that she would go to Carter's residence to do drugs, specifically cocaine. She testified that she exchanged text messages and Facebook messages with Carter but she had never had any consensual sexual relations with him.

**{¶50}** S.S. testified that on the morning of April 19, 2018, she went to Carter's residence and bought some cocaine off of him. She testified that she hung out with Carter that day, watching television downstairs, but that they eventually went upstairs to his bedroom together to watch television. She testified that there was a bigger television upstairs and people hung out there because his room was "big enough." (Tr. at 283). She testified that she had been upstairs to watch television there on a few occasions.

**{¶51}** S.S. testified that she sat at the foot of Carter's bed and that Carter sat at the head of the bed. S.S. testified that there was a futon in the room but it was covered in clothes so the bed was really the only place to sit. At one point, S.S.

---

[7] The kidnapping charge was merged with the rape for purposes of sentencing, thus technically Carter does not have a final conviction and sentence on the kidnapping charge. *State v. Adkins*, 3d Dist. Allen No. 1-19-71, 2020-Ohio-6799, ¶ 40. However, if we reversed the rape convictions for any reason, the kidnapping could be reinstated assuming the charge was still supported by the evidence. As it stands, however, we generally do not have to address the weight of evidence with regard to the kidnapping counts that were merged pursuant to sentencing. *Id*.

testified that Carter asked if she wanted to "do anything," intimating something sexual, and S.S. responded that she did not. (Tr. at 286). Carter then went downstairs, and S.S. testified that when Carter came back upstairs he was acting different, "being mean" and "giving [her] weird looks." (*Id*. at 291). She testified she had never seen Carter act like that before, like something was really bothering him.

**{¶52}** S.S. testified that Carter grabbed her hair and pulled her back and said that "he should beat the fuck out of [her] * * * and put [her] in a body bag." (Tr. at 292-293). S.S. testified that Carter then struck her in her face. Next, S.S. indicated that Carter held her down and penetrated her anal cavity with his penis against her will. She testified that Carter also forced her to perform oral sex on him, and that Carter forced his penis into her vagina. She testified that she tried to resist and that she screamed. She indicated that she screamed so loud that she thought Carter's mom could hear her from the neighboring duplex because Carter's mother called three times in quick succession during the assault.

**{¶53}** S.S. testified that during the incidents Carter held the back of her head by her hair and pulled some of her hair out. She testified that Carter was much bigger than her and there was nothing she could do because he controlled "every movement [she] could make." (Tr. at 296). She testified that Carter said she could

not leave until Carter got what he wanted. She testified that Carter ejaculated inside of her.

{¶54} S.S. testified that Carter eventually let her get up and put her clothes on. She testified that she then ran downstairs to the back door, which she commonly used to enter and leave from the residence. She testified that the door was locked from the inside, and that a key was normally inside the lock so she could get out but the key was not in the lock. S.S. testified that she left through the front door but before she did Carter asked her if he was ever going to see her again.

{¶55} After leaving Carter's residence, S.S. picked up her child from daycare then called her friend. S.S.'s friend encouraged her to go to the hospital, which S.S. then did.

{¶56} At the hospital S.S. was seen by a SANE. The SANE conducted an examination of S.S. and found "multiple skin tears around the vaginal orifice and perianal, around the anus." (Tr. at 375). She found that there was redness and swelling of the cervix itself, and that there was a four millimeter laceration on the right side of the vaginal wall. The SANE testified that the laceration was significant and indicated some force was used, and that she would not expect to see tearing like that with consensual sex.

{¶57} The SANE also noted bruising on the outside of S.S.'s right leg, around the neck and over the abdomen. There were also scratches by S.S.'s

collarbone, scratches by the groin area, and scratches and bruises down her legs. The SANE collected DNA swabs and other evidence. DNA consistent with Carter was found on the swabs taken from S.S.

{¶58} A Lima Police Officer was dispatched to the hospital and he spoke with S.S. He indicated that S.S. was initially very afraid of the perpetrator but eventually she told him her story. He also indicated that S.S. did not want to mention her drug use and she was reluctant to do so. Photographs of the bruising on S.S. were taken, along with a picture of S.S.'s missing hair.

{¶59} Through cross-examination at trial, Carter's attorney attacked S.S.'s credibility and also suggested that she was infatuated with Carter. Text messages between S.S. and Carter *prior* to the incident were introduced into evidence including what appeared to be the first text message between the two wherein S.S. was the one who reached out to Carter.

{¶60} Over time, some of the text messages between S.S. and Carter turned somewhat sexual in nature. One text message from S.S. stated, "I smell like you" and Carter responded "you gave me blue balls[.]" (Def. Ex. A-26). S.S. replied "I'm sorrrrry[.]" (*Id.*)

{¶61} On a later date Carter sent a text message to S.S. stating, "I can't keep us a secret no longer now lol," and S.S. responded, "Yes u can" and "not funny." (Def. Ex. A-91). Carter replied, "I'm sorry I just can't" and "I have to tell the world

I'm a Put It on Facebook." (*Id.*) Other text messages were introduced wherein S.S. repeatedly told Carter to contact her or call her and there was one where S.S. told Carter that he should "run back to Katie." (Def. Ex. A-119).

**{¶62}** On another occasion, in the week prior to the alleged incident, S.S. sent a text message to Carter asking him if he was "mad bc I didn't give you head[?]" (Def. Ex. A-113).

**{¶63}** In the early morning hours before the incident, text messages were exchanged between S.S. and Carter wherein Carter stated, "These pillows taking your place seems like you're still here," and S.S. responded, "Aww, I wish I was. I didn't want to leave." (Tr. at 328). She also added, "They probably even smell like me a little bit." (*Id.*) Carter responded "The one I'm lying on do a little bit" and S.S. said, "Good." (*Id.*)

**{¶64}** Notably, there were no text messages entered into evidence that occurred after the alleged incident, if any were exchanged at all.

**{¶65}** On cross-examination S.S. ultimately acknowledged that she liked Carter "as more than a friend" and she admitted that she did not tell officers. (Tr. at 325). She also acknowledged that at one point she texted Carter that she was with her mom and "she don't know I go for black guys." (*Id.*. at 330). Further, she also acknowledged that she had a boyfriend and that her boyfriend had been physically abusive with her in the past.

Analysis

**{¶66}** Carter argues that his convictions related to S.S. were against the manifest weight of the evidence because he contends that S.S. lacked credibility due to lying to police and due to the fact that she seemed to be keeping the relationship she had with Carter a secret from her mother and boyfriend. Further, Carter argues that S.S.'s claim that she went upstairs simply "to watch television" was not credible given that there was a large functioning television downstairs. Carter claims that S.S. appeared to be attempting to conceal the more likely source of her injuries— her jealous/angry boyfriend.

**{¶67}** Undoubtedly S.S.'s credibility is a central issue in this case. However, while there were potential issues with her credibility such as her drug use, her omissions in her statements to police, and her texts with Carter, all of these issues were put before the jury. The jury was able to see and hear S.S.'s explanations and evaluate her in person. A reviewing court must allow the trier-of-fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). The trier-of-fact is best able "to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 24. The jury may take note of any inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a

witness's testimony." *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

**{¶68}** We will not second-guess the jury's determination in this matter in finding that the State had established beyond a reasonable doubt that Carter committed the crimes alleged against S.S. "When there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not [this court's] province to choose which [version] we believe." *State v. Dyke*, 7th Dist. Mahoning No. 99 CA 149, 2002 WL 407847, 2 (Mar. 13, 2002), citing *State v. Gore*, 131 Ohio App.3d 197, 201 (7th Dist.1999). Carter's convictions are not against the manifest weight of the evidence merely because the jury rejected the defense's theory of consensual sex and found the State's version of the events to be more believable. *State v. Ford*, 8th Dist. Cuyahoga No. 107541, 2019-Ohio-2570, ¶ 79

**{¶69}** Moreover, while S.S.'s credibility was key in this matter, there was some corroborating evidence to S.S.'s story. Carter's DNA was found on the swabs taken from S.S. There were bruises on S.S.'s body and pictures were taken of those injuries. Most notably, however, the SANE specifically testified that the four millimeter laceration in S.S.'s vagina indicated force and that she would not have expected to see those injuries during a consensual encounter.

{¶70} After reviewing the record we cannot find that the jury clearly lost its way or created a manifest miscarriage of justice by convicting Carter of the crimes related to S.S. She clearly testified to Carter restraining her liberty while he forcefully penetrated her anus, mouth, and vagina with his penis. Her injuries were consistent with her testimony. For all of these reasons, Carter's third assignment of error is overruled.

*Fourth Assignment of Error*

{¶71} In Carter's fourth assignment of error, he argues that his rape and kidnapping convictions related to S.H. were against the manifest weight of the evidence.

Evidence Regarding the Rapes and Kidnapping of S.H.[8]

{¶72} S.H. testified that she was friends with Carter and that they dated for over a year back around 2015. S.H. indicated that in 2015 she used cocaine at parties and that she got the cocaine from Carter. S.H. testified that in their early days of dating, Carter was caring, loving, and protective.

{¶73} However, S.H. testified regarding an incident that occurred around June of 2015 wherein Carter was violent, restrained her liberty, and raped her. S.H. testified that Carter had a party in June of 2015 and at one point, S.H. went upstairs with a male and a female named Sarah to "snort powder." (Tr. at 471). S.H. testified

---

[8] The same statutes and standard of review from the third assignment of error are applicable to the fourth assignment of error.

that she locked the door to Carter's bedroom to get away from her brother because he was being annoying that evening.

{¶74} According to S.H., Carter came upstairs shortly thereafter and banged on the bedroom door because it was locked. S.H. testified that Carter was angry because the three individuals were locked in his bedroom together. Further, S.H. testified that when she opened the door for Carter, Sarah had her shirt pulled partially up because she was showing the male scars from cancer surgery.

{¶75} All of the individuals went back downstairs and S.H. testified that the party continued until everyone left. S.H. testified that she got intoxicated to the point of being "messed up." (Tr. at 474).

{¶76} After the other individuals at the party left, S.H. and Carter went upstairs to Carter's bedroom. S.H. testified that Carter wanted her to "give him head" but she could not because her mouth was too dry from drug use. (*Id.*) She told him she could not do it. S.H. testified that Carter was angry and that he slapped her. She testified that he had never done anything like that before. She testified that she then tried to "give him head" even though she did not want to because she was upset. (*Id.* at 475). Eventually she stopped and Carter was angry with her for not finishing the act.

{¶77} S.H. testified that in his anger Carter broke her phone. He also told her to take her clothes off. She felt like she did not have a choice in the matter

because she did not want to make him more angry. S.H. testified that Carter had a gun and he let her know that he had it but she did not recall Carter pointing it at her.

{¶78} S.H. testified that at one point Carter cut off a chunk of her hair without her permission. She asked him to stop but he laughed. S.H. testified that she tried to leave but Carter would not let her and he would not let her put her clothes on. Carter even followed her to the bathroom and stood in the doorway while she urinated.

{¶79} S.H. testified that hours passed and she was not permitted to sleep. Later, they went downstairs to the kitchen and Carter ate lasagna. S.H. believed at that point that she was wearing one of Carter's t-shirts.

{¶80} Eventually she testified that Carter took her to the house where her friend Sarah was staying because Carter wanted to ask Sarah about what happened in his bedroom while the door was locked during the party. On the way, S.H. testified that Carter rolled stop signs and that when she would reach for the door handle he would tell her "don't do it." (Tr. at 490).

{¶81} S.H. testified that Sarah was sleeping when they arrived. S.H. claimed that Carter put S.H. and Sarah up against a wall and was "going off" asking what was happening up in his room behind the locked door. (*Id*. at 492). S.H. testified that Carter was putting the gun in their faces. After Sarah explained that nothing sexual had happened in the bedroom at the party, Carter took S.H. back to his house.

{¶82} S.H. testified that they went upstairs to Carter's room wherein Carter forced her to perform oral sex. She testified that at one point Carter tried to put the gun inside of her "butt" and "vagina," but Carter was unsuccessful in putting the gun in her "butt." (Tr. at 495).

{¶83} S.H. testified that Carter pulled out a video camera and started recording her. During the 2018 search of Carter's residence, video clips were recovered of S.H. that she believed were from the incident in question. Three clips were played for the jury, totaling just over twelve minutes. In the first clip, S.H. is asking Carter not to record her. Carter says he wants to in order to make "memories" in case he did not see her anymore. (State's Ex. 61).

{¶84} On the second clip, Carter repeatedly tells S.H. to "open them legs up" because he wanted to see her vagina. (State's Ex. 61). S.H. kept her legs firmly closed and Carter said "do what I say." (*Id*.) S.H. questioned Carter, saying he must like having women do what he tells them.

{¶85} At another point, Carter tells S.H. he is going to forcefully open her legs, but he was not going "to rape her" and she could not call that "rape." (*Id*.) S.H. could be heard stating she did not want to do that. Carter continued to repeatedly tell S.H. to open her legs and S.H. refused.

{¶86} On the third video S.H. is visibly and audibly crying while Carter touches her vagina and digitally penetrates her by spreading her labia. Carter says

things like "you guys know why she's crying, 'cus she love it." (State's Ex. 61). He also tells her that they get to relive the moment. Eventually he says she does not want to do anything else on camera so he ends the video.

{¶87} S.H. testified that after the camera was put away she engaged in vaginal, anal, and oral sex with Carter. She testified that she felt like she did not have a choice but to engage in the sexual acts.

{¶88} S.H. testified that she was eventually allowed to leave Carter's residence to pick up her daughter, ending the long ordeal. S.H. acknowledged that she stayed in a relationship with Carter even after the ordeal, but she stated Carter never forced any sexual acts on her again.

{¶89} On direct examination, S.H. acknowledged multiple credibility issues. At the beginning of her testimony, S.H. claimed she had been sober for six months; however, before her direct examination concluded she acknowledged that she lied, stating that she had relapsed the week before the trial and she had talked to Carter on the phone. She testified that in spite of everything she still loved Carter.

{¶90} S.H. also acknowledged an incident near the end of her relationship with Carter wherein she became enraged and repeatedly rammed her vehicle into Carter's vehicle. S.H. was charged because of the incident.

{¶91} The State also presented the testimony of Sarah, S.H.'s friend. Sarah testified regarding the incident wherein Carter came over and woke her up to ask

about what happened in his locked bedroom. Sarah testified that S.H. was selling cocaine to the male in the locked room for privacy. Sarah testified that she showed the male her cancer scars because the male was talking about a family member with cancer. Sarah testified she did not remember Carter coming up to the room.

{¶92} Sarah testified that in the early morning hours following the party she was awakened because S.H. and Carter were at the residence where Sarah was staying. Sarah testified that Carter was upset and he had a gun with him. Sarah testified that Carter wanted to know if S.H. had cheated on Carter in the bedroom because the door was locked. After confirming that Sarah was sure about her story, Carter and S.H. left.

{¶93} Throughout the evidence presented, S.H.'s credibility was challenged from multiple angles. Defense counsel elicited testimony that S.H. and Carter's relationship was "toxic." Defense counsel also elicited inconsistent statements from S.H. wherein, *inter alia*, she had said before that Carter was in a rage during the ordeal, but at trial she stated he was calm during the situation. She also had initially told the detective that Carter tore her clothes off but later said Carter asked her to take her clothes off.

{¶94} In his case-in-chief, Carter called witnesses who testified that S.H. was a jealous woman. Witnesses also stated that S.H. had never mentioned any rape incident, contrary to her testimony. One witness testified that S.H. told him that

S.H. had the police on speed dial and that she was lying about the incident. Another witness testified that he heard Carter speaking to S.H. on the phone while S.H. was high the weekend before the trial. At that time, the witness stated that S.H. said if Carter gave S.H. his "whole wallet," and some cocaine, S.H. would change her testimony to say she was just role playing. (Tr. at 761).

{¶95} When the case was submitted to the jury, Carter was found guilty of the oral and vaginal rape of S.H., and the kidnapping of S.H. He was acquitted of the anal rape of S.H., and he was acquitted of the firearm specifications.

Analysis

{¶96} Carter contends that S.H.'s testimony has even less support than S.S.'s testimony because there was no physical evidence available. He also contends that the inconsistencies in S.H.'s testimony, and the fact that she apparently tried to solicit money or drugs from Carter shortly before the trial destroyed her credibility.

{¶97} As we stated in the previous assignment of error, a reviewing court must allow the trier-of-fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). The trier of fact is best able "to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 24. The jury may take note of any inconsistencies and resolve them accordingly,

"believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶98} Thus while defense counsel pointed out multiple inconsistencies with S.H.'s testimony, the jury was free to believe all, part, or none of her claims. In fact, the jury evidently did not believe her claim of anal rape, at least to the level of beyond a reasonable doubt, showing that the jury was discerning in its deliberations.

{¶99} Moreover, while Carter claims there is significantly less evidence related to his charges against S.H., the video clips would show otherwise. One of the videos actually shows Carter digitally penetrating S.H. while she is crying, after she had repeatedly told him she did not want to open her legs or be on camera. A jury could have determined that this act alone could have satisfied the vaginal rape against S.H. in Count 5.[9] But S.H. also testified to vaginal intercourse that occurred after the video in question.

{¶100} Further, although Sarah's testimony did not entirely corroborate S.H.'s testimony, it did corroborate the testimony in parts, such as the drug incident

---

[9] "The insertion need only be slight to be considered vaginal penetration." *State v. McCoy*, 3d Dist. Marion No. 9-18-23, 2020-Ohio-4511, ¶ 72; *see also State v. Lucas*, 2d Dist. Montgomery No. 18644, 2001 WL 1103288, *3 (Sept. 21, 2001) ("It is sufficient if the evidence shows that the force of the object caused the outer lips of the victim's vagina, the labia, to spread."); *State v. D.H.*, 10th Dist. Franklin No. 16AP-501, 2018-Ohio-559, ¶ 40 ("Thus, any force which causes the labia to spread apart, and allows the slightest insertion of any object or part of the body into the vaginal opening, amounts to sexual conduct under R.C. 2907.01(A).").

in Carter's bedroom behind a locked door, and Carter bringing S.H. to Sarah's residence in the early morning hours to ask about the incident. Thus parts of the story remained consistent across multiple witnesses.

{¶101} In sum, while the evidence was in conflict, we cannot find that this is a case where the jury clearly lost its way or created a manifest miscarriage of justice. S.H.'s testimony and the video clips in State's Exhibit 61 support the jury's guilty findings of two counts of rape and one count of kidnapping related to victim S.H. Therefore, Carter's fourth assignment of error is overruled.

*Conclusion*

{¶102} For the foregoing reasons Carter's assignments of error are overruled and the judgments and sentences of the Allen County Common Pleas Court are affirmed.

*Judgments Affirmed*

**ZIMMERMAN, P.J. and MILLER, J., concur.**

**/jlr**